# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

CRESTBROOK INSURANCE COMPANY,

     Plaintiff,

v.                                        Case No. 2:22-cv-2406-MSN-atc

ANDREW K. CROSBY and
MOLLY CALDWELL CROSBY,

     Defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND GRANTING MOLLY AND ANDREW CROSBY'S MOTION FOR JUDGMENT ON THE PLEADINGS

---

Before the Court are (1) Plaintiff's Motion for Judgment on the Pleadings[1] (ECF No. 32, "Plaintiff's Motion"), and (2) Molly and Andrew Crosby's Motion for Judgment on the Pleadings (ECF No. 33, "Defendants' Motion").  For the reasons set forth below, Plaintiff's Motion is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' Motion is **GRANTED**.

## BACKGROUND

This matter began as insurance dispute about whether Defendants Andrew Crosby and Molly Crosby (collectively, the "Crosbys") have coverage under their homeowner's insurance

---

[1] On January 6, 2023, Plaintiff filed a motion seeking to exceed the Local Rules' page limitations for its Motion.  (*See* ECF No. 38.)  Plaintiff's counsel states that she did not realize Plaintiff's Motion exceeded the Local Rules' page limitations until opposing counsel contacted her to consult about Defendants' request to exceed the page limitations for its response to Plaintiff's Motion.  (*See id.* at PageID 694–95.)  Plaintiff's request to exceed the page limitations is unopposed.  (*Id.*)  Although the Court usually requires parties to request permission to exceed the page limitations *prior* to filing a document, the Court appreciates counsel's candor and efforts to correct her mistake.  Plaintiff's motion to exceed the page limitations is **GRANTED**.   The Court considers Plaintiff's Motion in its entirety.

policy for claims brought against them in *Jane Doe, by and through her parents and next friends,*
*John Doe and Janet Doe v. Andrew K. Crosby and Molly Caldwell Crosby*, No. CT-5092-21, in
the Circuit Court of Shelby County, Tennessee (the "Underlying Litigation").  Plaintiff Crestbrook
Insurance Company ("Crestbrook") filed its Complaint in this matter seeking a declaration that (1)
it has no duty to defend or indemnify Andrew Crosby in the Underlying Litigation, and (2) it has
no duty to defend or indemnify Molly Crosby in the Underlying Litigation and should be allowed
to withdraw the defense provided to her under a reservation of rights.  (ECF No. 1 at PageID 9–
10.)  The Crosbys have asserted counterclaims against Crestbrook for (1) breach of contract (ECF
No. 27 at PageID 472–73); (2) bad faith refusal to provide a defense to Andrew Crosby in the
Underlying Litigation (*id.* at PageID 473–74); (3) breach of the duty of good faith and fair dealing
(*id.* at PageID 474–75); (4) negligence for disclosing the Crosbys' policy limits when Crestbrook
filed its Complaint herein (*id.* at PageID 475); and (5) a declaration that Crestbrook has a duty to
defend them in the Underlying Litigation (*id.* at PageID 475).[2]

A.    **The Underlying Litigation**

The Underlying Litigation resulted from events occurring during a "slumber party" of
several eighth-grade girls at the Crosbys' home on or around May 15, 2020.  (ECF No. 1-1 at
PageID 14.)  Relevant here, the complaint in the Underlying Litigation alleges as follows:

> 14.    On or about May 15, 2020, Defendant Molly Crosby traveled out of
> town with her older daughter leaving Defendant Andrew Crosby at home with the
> couple's younger daughter.
>
> 15.    On May 15, 2020, the Crosbys' younger daughter who was in eighth
> grade at the time, had a sleep-over with three other eighth grade girls with Andrew
> Crosby being the only adult chaperone for this eighth grade slumber party. Upon
> information and belief, Defendant Molly Crosby knew about this slumber party and

---

[2]  The Crosbys assert that whether Crestbrook has a duty to indemnify them for the
Underlying Litigation is not yet ripe or, alternatively, they are entitled to a declaration that
Crestbrook is required to indemnify them with respect to the claims in the Underlying Litigation.
(ECF No. 27 at PageID 476.)

agreed to allow her eighth grade daughter to have this slumber party while she was out of town knowing that the girls would be chaperoned by her husband and only her husband. Defendant Andrew Crosby also allowed his daughter to have this slumber party knowing that he would be chaperoning the slumber party by himself.

16.     By way of alternative pleading, Defendant Molly Crosby did not know about the slumber party before her daughter invited the other girls over to spend the night but failed to implement rules to protect invited guests from harm before she left for the weekend that would prevent her husband from hosting slumber parties while she was not at home.

17.     On the evening of May 15, 2020, the Crosbys' daughter slept in her room with her door closed. Upon information and belief, Jane and two of the other girls slept in the playroom. The following morning, Defendant Crosby engaged in flirtatious conduct with Jane and then came back into the room where he knew Jane was and started to masturbate. Jane heard a noise behind her and turned to see Defendant Crosby naked in the playroom, masturbating. He was looking at the girls while masturbating and made direct eye contact with Jane.

18.     Despite being seen engaging in this incredibly inappropriate behavior, Mr. Crosby did not immediately leave the room after making eye contact Jane. Even after Jane turned away, she could still hear him masturbating behind her in the playroom. When he finally left, she immediately called her mother who reported the incident to the Memphis Police Department.

19.     Mr. Crosby originally denied that he masturbated in front of the girls, but has now told others that he walked through the house naked when the girls were there and masturbated in a room near the playroom where Jane and the other girls could see him. While he has now admitted to others that he was masturbating in a room near the playroom, he is apparently claiming that he did not think the girls would see him when he engaged in this inappropriate conduct.

20.     Plaintiffs assert that Mr. Crosby entered the playroom with the full intent to masturbate while watching Jane and her other minor friends and continued to masturbate with impunity after making eye contact with Jane, causing her to suffer extreme emotional distress. Plaintiffs assert that Defendant Crosby knew she was awake because he had already engaged her in conversation earlier that morning. Mr. Crosby is liable to Jane for his outrageous conduct for the tort of intentional infliction of emotional distress.

21.     By way of alternative pleading, Plaintiffs assert that Defendant Crosby is liable to her for the tort of negligent infliction of emotional distress. If the jury in this cause believes the story told by Defendant Crosby (that he went into an upstairs room near the playroom and masturbated in that room and not the playroom with no intent to be seen by others), Defendant Crosby would be liable to Jane for the tort of negligent infliction of emotional distress as it would indeed be negligent and irresponsible for him to masturbate where children could see him

3

when he knew or should have known that his daughter's friends were still in his home.

. . .

23.     Defendant Crosby's inappropriate conduct did not stop on the day of the incident. After Jane reported what happened to her, Defendant Crosby engaged in a campaign to damage Jane's reputation. He repeatedly stated that Jane was lying about the incident and repeatedly told others that she was a liar in general and said other untrue and unfair things to impugn her character.

24.     Defendant Molly Crosby knew or should have known that it was not safe for Jane and the other young girls to be in the house with Andrew Crosby, particularly when there was no other adult present. Defendant Molly Crosby further knew or should have known that her husband was saying unfair and untrue things about the victim and failed to do anything to protect this child from harm.

. . .

28.     Defendant Molly Crosby failed to warn Jane or her parents of the potential peril in which Jane was placed as a result of Ms. Crosby being out of town and there being no adult supervision other than Andrew Crosby to chaperone and failed to warn them before this incident about her husband's inappropriate conduct.

29.     Plaintiffs allege that Defendant Andrew Crosby engaged in the above-described actions with the intent to emotionally harm Jane.

30.     By way of alternative pleading, Plaintiffs allege that although Mr. Crosby engaged in this behavior in a place where Jane could observe him without the intent of being seen.

31.      In engaging in the above-described conduct, one or both Defendants acted negligently and/or recklessly.

. . .

47.     Defendant Andrew Crosby made numerous false statements about Jane to other individuals. Those statements included defamatory allegations which were designed to expose Jane to contempt or ridicule. He made repeated efforts to impugn Jane as a mentally unstable and dishonest person and one who should not be believed. Mr. Crosby made these false and defamatory statements knowing that they were false or with utter disregard to their truth or falsity. His comments were damaging to Jane's reputation and were hurtful to her as a minor child. Defendant Andrew Crosby is liable to Jane for his defamatory and slanderous statements.

48.     In his conversations with friends and neighbors about the allegations described herein, Defendant Andrew Crosby purported to have private information (that he knew was not accurate) about Jane Doe which he exposed to those friends

and family members. Mr. Crosby is liable to Jane for such wrongful communication, for invasion of her privacy and for placing her in false light.

49.     Defendant Crosby acted with malice, recklessness and with gross negligence.

50.     By way of alternative pleading, when Mr. Crosby was masturbating in plain sight of his daughter's friends, he thought they were asleep or not looking in his direction. He owed those girls, including Jane, the duty to use reasonable care and act as an ordinary prudent person when engaging in this behavior and under those circumstances. Mr. Crosby breached that duty of care and in doing so, his breach was the cause in fact and proximate cause of Jane Doe's serious and severe emotional harms. Accordingly, Defendant Andrew Crosby is liable for his negligence, including his negligent infliction of emotional distress.

(ECF No. 1-1 at PageID 14–20.)

The complaint in the Underlying Litigation alleges several causes of action against Andrew Crosby, including, in relevant part, (1) negligence and negligent infliction of emotional distress, and (2) defamation, slander, and false light invasion of privacy.  As to Molly Crosby, the complaint in the Underlying Litigation asserts claims for (1) negligence, (2) negligent infliction of emotional distress, and (3) premises liability.

## B.     The Insurance Policy

At the time of the alleged events in the Underlying Litigation, the Crosbys had a homeowner's insurance policy issued by Crestbrook (the "Policy").  Under "Coverage E— Personal Liability," the Policy provides that Crestbrook "will pay damages an **Insured** is legally obligated to pay due to an **Occurrence** resulting from: (a) negligent personal acts or negligence arising out of the ownership, maintenance or use of real or personal property at an **Insured Location** . . . ." (ECF No. 1-2 at PageID 63.)  The Policy provides that an "'**Occurrence**' means an accident, including continuous or repeated exposure to the same general condition.  It must result in **Bodily Injury**, **Property Damage** or **Personal Injury** caused by an **Insured**."  (*Id.*)  The definition of "**Personal Injury**" includes "libel, slander, defamation of character, or invasion of

rights of privacy," and also "shock, emotional distress or mental injury . . . ."  (ECF No. 1-2 at PageID 62.)[3]

Also at issue are three exclusions from the Policy's personal liability coverage.  The Policy provides that personal liability coverage does not apply to "**Personal Injury**" if it (1) was "caused intentionally by or at the direction of an Insured, including willful acts the result of which the Insured knows or ought to know is likely to follow from the Insured's conduct," ("Intentional Acts Exclusion"); (2) was "caused by or resulting from an act or omission which is criminal in nature and committed by an Insured . . . regardless of whether the **Insured** is actually charged with, or convicted of a crime," ("Criminal Acts Exclusion"); or (3) resulted "from acts or omissions relating directly or indirectly to sexual molestation, corporal punishment, physical or mental abuse, harassment, including sexual harassment, whether actual, alleged or threatened" ("Molestation Exclusion").  (ECF No. 1-2 at PageID 65 & 67.)

## JURISDICTION & CHOICE OF LAW

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Crestbrook is an insurance company incorporated in Ohio with its principal place of business in Ohio.  (ECF No. 1 at PageID 1.)  The Crosbys are citizens and residents of Shelby County, Tennessee.  (*Id.*)  Further, the amount in controversy exceeds $75,000.  The parties agree that Tennessee law governs their dispute, so the Court will not conduct a choice-of-law analysis *sue sponte*.  S*ee GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998).

---

[3] The parties do not dispute that Jane Doe's alleged emotional injuries are covered under the Policy as a "Personal Injury."  (*See* ECF No. 32-1 at PageID 613; ECF No. 34-1 at PageID 655; ECF No. 39 at PageID 701–02 n.4.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss.  *See Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016); *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Hunter v. Ohio Veterans Home*, 272 F. Supp. 2d 692, 694 (N.D. Ohio 2003).

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  Using this framework, the court determines whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  A complaint need not contain detailed factual allegations; however, a plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).   In other words, the "[f]actual allegations must be enough to raise a right to relief above [a] speculative level." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  If a court decides in light of its judicial experience and common sense, that the claim is not plausible, the case may be dismissed at the pleading stage.

*Iqbal*, 556 U.S. at 679.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 556.

## DISCUSSION

**A.**   **Interpretation of the Policy**

Whether an insurer has a duty to defend "depends solely on the allegations contained in the underlying complaint."  *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W. 3d 758, 768 (Tenn. 2006).  A duty to defend arises if the underlying complaint alleges claims that "are within the risk covered by the insurance contract and for which there is a potential basis for recovery."  *Id.*  "If even one of the allegations is covered by the policy, the insurer has a duty to defend, irrespective of the number of allegations that may be excluded by the policy."  *Drexel Chem. Co. v. Bituminous Ins. Co.*, 933 S.W. 2d 471, 480 (Tenn. Ct. App. 1996).  Any doubt about whether a potential claim triggers coverage is resolved in favor of the insured.  *Travelers Indem. Co. of Am. v. Moore & Assoc., Inc.*, 216 S.W.3d 302, 305 (Tenn. 2007); *Southland Mall, LLC v. Valor Sec. Servs., Inc.*, No. W2003-03066-COA-R3-CV, 2005 WL 762616, at *4 (Tenn. Ct. App. Apr. 4, 2005) (quoting *Dempster Brothers, Inc. v. United States Fid. & Guar. Co.*, 388 S.W.2d 153, 156 (1964)) ("[I]n case of doubt as to whether or not the allegations of the complaint against the insured state a cause of action within the coverage of their liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in the insured's favor.").

Courts apply the same rules of construction to an insurance policy as they do to any other contract.  *Travelers Indem.*, 216 S.W.3d at 305–06 (citing *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990)).  The insurance contract's terms "must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning."  *Naifeh*, 204 S.W.3d at 768.  Any ambiguity in the policy's terms, however, will be construed in the insured's favor.  *See Am. Justice Ins. Reciprocal*

*v. Hutchison*, 15 S.W. 3d 811, 815 (Tenn. 2000).  The goal is to "determine the intention of the parties and give effect to that intention." *Naifeh*, 204 S.W. 3d at 768.

The Court begins by analyzing the Policy to determine first, whether any allegation from the Underlying Litigation is within the Policy's liability coverage for an "occurrence," and, if so, whether any exclusions in the Policy nevertheless deny coverage for the Crosbys.

1.    Was there an "occurrence" under the terms of the Policy?

The Policy provides personal liability coverage due to an "occurrence" that is the result of "negligent personal acts . . . ."  (ECF No. 1-2 at PageID 63.)  The Policy defines "occurrence" as an "accident."  (*Id.* at PageID 62.)  The Policy does not further define "accident" other than to clarify that it includes "continuous or repeated exposure to the same general condition" and must result in "Bodily Injury, Property Damage or Personal Injury."  (*Id.*)  Although the Policy does not provide a precise definition of "accident," the parties agree that, under Tennessee law, an "accident" means "an event not reasonably to be foreseen, unexpected and fortuitous."  *Main St. Am. Assurance Co. v. Marble Sols., LLC*, 557 F. Supp. 3d 844, 852 (W.D. Tenn. 2021) (quoting *Travelers Indem. Co.*, 216 S.W. 3d at 308); (*see* ECF No. 32-1 at PageID 613–14; ECF No. 39 at PageID 703; ECF No. 34 at PageID 640; ECF No. 35 at PageID 673).  The term "accident" may encompass a negligent act, yet "accident and negligence are not synonymous." *Guideone Am. Ins. Co. v. Perry*, No. 2:15-CV-2085-SHL-CGC, 2016 WL 7497583, at *3 (W.D. Tenn. Apr. 12, 2016) (quoting *Gassaway*, 439 S.W.2d at 607).

In some circumstances, the distinction between negligence and an accident turns on the insured's knowledge of facts that may make the results foreseeable or expected.[4]  *Id.* (citing

---

[4] However, in the context of an accidental death policy, the Tennessee Supreme Court has stated that it "agree[s] that the importation of the tort principle of foreseeability into the

*Gassaway*, 439 S.W.2d at 607.)  For example, in *Gassaway*, the insured, V & M Homes, built an underground storm sewer on a lot.  439 S.W.2d at 610.  A house was subsequently built on the lot, and water from the sewer flowed underneath it, causing the home's foundation to settle, which resulted in significant damage to the house.  *Id.* at 606.  The Tennessee Supreme Court held that the damage to the house was not the result of an "accident" because V & M Homes knew the sewer created a risk and, therefore, it could have reasonably foreseen what occurred.  *Id.* at 608–09.

Yet some outcomes that are foreseeable are nevertheless "accidents": Otherwise, a liability policy would be rendered almost meaningless "[b]ecause, by definition, negligence requires that damages be foreseeable." *Travelers Indem. Co.*, 216 S.W. 3d at 308–09; *Cincinnati Ins. Co. v. Orten*, No. 3:17-CV-00036, 2019 WL 6895980, at *7 (M.D. Tenn. Feb. 5, 2019) (quoting *Harrell v. Metro. Life Ins. Co.*, 401 F. Supp. 2d 802, 813 (E.D. Mich. 2005)) ("[A] 'reasonably foreseeable' standard is quite broad; if all 'reasonably foreseeable' injuries are excluded from coverage, then the definition of accident may frustrate the legitimate expectations of plan participants, for insurance presumably is acquired to protect against injuries that are in some sense foreseeable.").

So, "how much foreseeability is required to render an unintended act non-accidental for insurance purposes"?  *Cincinnati Ins. Co.*, 2019 WL 6895980, at *7.  As one court put it, "foreseeability is an elastic concept," *Cincinnati Ins. Co.*, 2019 WL 6895980, at *6, and figuring out whether damages "resulted from an accident so as to make the insurer liable requires" the court to examine "the entire factual situation." *Gassaway*, 439 S.W.2d at 608.  In suits for property damage, Tennessee courts seem to favor a narrow construction of "accident" and focus on the

---

interpretation of a private insurance contract is inappropriate." *Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996).

insured's knowledge of the condition that gave rise the damage or injury. *See Gassaway*, 439 S.W.2d at 608–10 (collecting cases). In cases involving vehicle collisions, however, Tennessee courts have interpreted "accident" broadly, finding that death or injuries resulting from a collision resulted from an "accident," even when the insured was intoxicated, drove recklessly, or both. *See Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 810–11, 815 (Tenn. 1996); *Cincinnati Ins. Co.*, 2019 WL 6895980, at *6–7 (applying Tennessee law).

a.       *Allegations as to Andrew Crosby*

The Court considers first whether at least one allegation in the Underlying Litigation against Andrew Crosby falls within the Policy's personal liability coverage as an "occurrence."[5] Resolving all doubts in favor of Andrew Crosby, as the Court must do, *see Travelers Indem. Co.*, 216 S.W.3d at 305, the Court finds that some of the alternative allegations allege injuries resulting from an "occurrence." Specifically, the allegations that Jane Doe saw Andrew Crosby masturbating in "an upstairs room near the playroom," (ECF No. 1-1 at PageID 16), but "that he did not think the girls would see him," (*id.* at PageID 14), because "he thought they were asleep or not looking in his direction," (*id.* at PageID 20), and that he had no "intent to be seen," (*id.* at PageID 16), constitute an "occurrence" under the Policy (the Court refers to these as the "alternative negligence allegations"). The allegations that Andrew Crosby defamed Jane Doe's character by stating "that Jane was lying about the incident and repeatedly . . . [telling] others that she was a liar in general," (ECF No. 1-1 at PageID 17), that Jane was a "mentally unstable and dishonest person and one who should not be believed," (*id.* at PageID 19), and other similar

---

[5] The parties agree that Crestbrook's duty to defend is triggered if a single allegation against an insured is covered. (*See* ECF No. 32-1 at PageID 611; ECF No. 33 at PageID 632 & n.1.)

defamatory statements (referred to herein as the "defamation allegations"), may also trigger Crestbrook's duty to defend, but final resolution of this issue is not necessary to resolve whether Crestbrook has a duty to defend.  The Court discusses the allegations in turn below.

i.   Alternative Negligence Allegations

Crestbrook argues that the alternative negligence allegations in the Underlying Litigation do not constitute an "occurrence" because "because Andrew Crosby's actions were done intentionally and the injury to Jane was expected."  (ECF No. 32-1 at PageID 614; *see* ECF No. 35 at PageID 674–77.)  They assert that "one cannot masturbate involuntarily," and because masturbating "requires a 'voluntary physical exertion,' . . . it cannot qualify as an 'accident.'" (ECF No. 32-1 at PageID 616; ECF No. 35 at PageID 676–77.)  In support of its argument, Crestbrook analogizes to two cases: *Allstate Ins. Co. v. Kaigler & Assocs., Inc.*, No. M201601003COAR3CV, 2017 WL 3841318 (Tenn. Ct. App. Aug. 31, 2017) and *Allstate Ins. Co. v. Rainey*, No. 29, 1986 WL 10086 (Tenn. Ct. App. Sept. 16, 1986).

First, *Allstate Ins. Co. v. Kaigler & Assocs., Inc.*, involved damages asserted in a class action complaint for the insured sending unsolicited fax messages in violation of the Telephone Consumer Protection Act ("TCPA").  2017 WL 3841318, at *1.  In addition to the statutory damages under the TCPA, the fax recipients alleged damages for loss of "paper, toner, and the use of their machines." *Id.*  The insured argued that his actions were covered by the "accidental event" coverage of his insurance policy "because he did not intend for the recipients of the bulk fax transmission to be injured." *Id.* at *3.  The court rejected the insured's argument, explaining that the "'act' of sending the faxes was intended" and the "loss of paper and toner" injury was "an expected result of the transmission of a fax." *Id.* at *4.  Crestbrook urges that, under *Kaigler*, the

Policy does not provide coverage because "Andrew Crosby's 'act' of masturbating . . . was intentional and the 'injury' . . . to Jane Doe, was an expected result." (ECF No. 32-1 at PageID 614–15.) Crestbrook's analogy, however, focuses on the wrong event. In *Kaigler*, the alleged injury was a direct result of sending unsolicited faxes; in other words, if the faxes were successfully transmitted, no additional acts or events were necessary to cause the injury. In contrast, Jane Doe's alleged injuries were not a direct result of Andrew Crosby masturbating—instead, Jane Doe's injuries occurred because she *saw* Andrew Crosby engaging in this act. Thus, the "intent" for purposes of analogy to *Kaigler* is the intent to be seen. For this reason, the analogy to *Kaigler* is unpersuasive.

For similar reasons, this Court is not moved by Crestbrook's analogy to *Rainey*, 1986 WL 10086. In *Rainey*, the insured went to his bedroom and got his pistol after seeing the knob on his front door turning "as if someone was trying to enter the house." *Id.* at *2. He returned to the front door, saw the knob still turning, opened the door, and fired a single shot, even though he never saw the person at whom he shot. *Id.* As it turned out, the insured shot his sister-in-law. *Id.* The court found that the insured acted intentionally when he fired the shot, and the injuries to his sister-in-law were therefore not unexpected. *Id.* Although the insured did not intend to injure his sister-in-law, he nevertheless intended to injure *someone* when he pulled the trigger. *Id.* The court therefore found that the policy's exclusion for "bodily injury intentionally caused by an insured person" applied and barred coverage. *Id.* Crestbrook attempts to analogize the insured pulling the trigger in *Rainey* to the Andrew Crosby masturbating, arguing both acts are intentional. However,

as explained above, the intent at issue here is the intent to be seen, and therefore, this Court does not find *Rainey* persuasive.[6]

In sum, Andrew Crosby failed to perceive, or he grossly misjudged, the risk that he would be seen engaging in his inappropriate behavior. Similar to what other courts have found, however, this Court finds that Andrew Crosby's failure to appreciate what was, at least in hindsight, an obvious risk, does not mean the result of that failure was "foreseeable or expected" to such an extent that Jane Doe seeing Andrew Crosby masturbating was not an "accident." *See Guideone*, 2016 WL 7497583, at *4; *Cincinnati*, 2019 WL 6895980, at *6–7; *see also Harrell*, 937 S.W.2d at 814–15. Therefore, the allegations in the Underlying Litigation that Andrew Crosby was masturbating in a different room with no intent to be seen constitute an "occurrence," and Crestbrook has a duty to defend Andrew Crosby unless an exclusion applies.

### ii.   Defamation and Invasion of Privacy Allegations

In the Underlying Litigation, the plaintiffs allege that Andrew Crosby made "defamatory and slanderous statements" about Jane Doe, which were meant to cast her as "a mentally unstable and dishonest person and one who should not be believed." (ECF No. 1-1 at PageID 19.) It is alleged that Andrew Crosby made those defamatory statements "knowing that they were false," or alternatively, "with utter disregard to their truth or falsity." (*Id.*) It is also alleged that Andrew Crosby invaded Jane Doe's privacy and placed her in a false light when he told friends and neighbors that he had "private information (that he knew was not accurate) about Jane Doe." (*Id.* at PageID 20.) According to the Crosbys, the defamation allegations assert that Andrew Crosby

---

[6] For accidental death policies, the Tennessee Supreme Court has expressly abandoned much of the reasoning in *Rainey*, concluding that "the distinction between 'accidental means' and 'accidental results' is illusory." *Harrell*, 937 S.W.2d at 815.

acted with "recklessness and gross negligence," which are "not intentional acts." (*See* ECF No. 34 at PageID 643.)  The Crosbys therefore argue that the defamation allegations constitute an "occurrence" that caused "personal injury," because, as defined, "personal injury," includes "slander, defamation of character, or invasion of rights of privacy." (*See* ECF No. 34 at PageID 642–43.)  In response, Crestbrook argues that it does not matter whether Andrew Crosby acted intentionally or merely recklessly because "the claims for defamation and invasion of privacy caused damage that was expected," and therefore, those claims do not arise from an "occurrence." (*See* ECF No. 35 at PageID 679.)

As discussed above, the Policy defines an "occurrence" as an "accident," which is not defined in the Policy but, under Tennessee law, generally means "an event not reasonably to be foreseen, unexpected and fortuitous."  *Main St. Am. Assurance Co.*, 557 F. Supp. 3d at 852.  The Policy, however, provides coverage for "occurrences" or "accidents" that result in "personal injury," and the definition of "personal injury" includes several torts that are inherently intentional, including false arrest, false imprisonment, wrongful detention, malicious prosecution, libel, slander, defamation of character, and invasion of rights of privacy. (*See* ECF No. 1-2 at PageID 62.)

The Sixth Circuit grappled with a similar interpretation issue in *N. Bank v. Cincinnati Ins. Companies*, which required the court to determine whether an employee's discrimination claim arising from the termination of his employment was an "occurrence."  125 F.3d 983, 984–85 (6th Cir. 1997) (applying Michigan law).  The insurance policy at issue defined "occurrence" as "an accident, or a happening or event . . . which unexpectedly or unintentionally results in personal injury . . . ."  *Id.* at 985 n.1.  "Personal injury" was defined as "bodily harm or injury, . . . mental

anguish or mental injury . . . arising out of: false arrest, false imprisonment or detention; . . . or malicious prosecution;" "discrimination or humiliation;" "[l]ibel, slander or defamation of character, invasion of private occupancy or invasion of rights of privacy . . . ." *Id.*   The Sixth Circuit concluded that because "the definition of personal injury . . . include[d] intentional torts" while "the definition of 'occurrence' . . . exclude[d] intentional torts," the policy's terms were "inconsistent and create[d] an ambiguity."   *Id.* at 986 (citing *Hurst–Rosche Eng'rs, Inc. v. Commercial Union Ins.*, 51 F.3d 1336, 1345 (7th Cir. 1995)).   And because any ambiguity had to be resolved in favor of the insured, the court held that the discrimination claim was an "occurrence."  *Id.* at 987–89; *see also Tews Funeral Home, Inc. v. Ohio Casualty Insurance Co.*, 832 F.2d 1037, 1045 (7th Cir. 1987)*; Hurst–Rosche*, 51 F.3d at 1345; *Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 240 (Ill. App. Ct. 2008).[7]

Other courts, however, have reached the opposite conclusion.  *See Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 746 (7th Cir. 2001); *Cincinnati Ins. Co. v. Shanahan*, No. 07-3164, 2008 WL 4426116, at *5 (C.D. Ill. Sept. 26, 2008).  Specifically, as to defamation, those courts note that "defamation is often not intended or expected to injure anyone" because, for example, "[t]he defamer may have made a good-faith though inadequate attempt to conceal the victim's name, may have thought the victim's reputation already impaired beyond the possibility of further damage, or . . . may have thought the defamatory statement true . . . ." *Eastern Atlantic*, 260 F.3d

---

[7] Other courts have addressed the issue in the context of an intentional acts exclusion; most of those courts concluded that when a policy's liability coverage included a specific type of claim or act, those specific claims or acts were not subject to the intentional acts exclusion. *See, e.g.*, *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 396–97 (D. Del. 2002) (collecting cases); *see also Tush v. Pharr*, 68 P.3d 1239, 1249 (Ala. 2003) (finding that "because the policy includes wrongful eviction, it must be deemed to be excluded from the intentional acts exclusion").

at 746; *see Shanahan*, 2008 WL 4426116, at *5 ("An intent to injure or expectation of injury is not an element of the tort of defamation."). For that reason, those courts have concluded the policies' inclusion of coverage for defamation is not inconsistent with the policies' exclusions for conduct intended or expected to injure. *Eastern Atlantic*, 260 F.3d at 746; *see Shanahan*, 2008 WL 4426116, at *5.

Consideration of the above cases yields more questions than answers here. Should the Court consider whether there is an ambiguity only as to defamation and invasion of privacy? If not, can the other intentional torts included in the definition of "Personal Injury" be committed without an intent to injure? Does it matter what type of policy is being considered—all risk, commercial liability, homeowner's, etc.? Fortunately, the Court need not resolve these questions at this time. For the reasons explained above, this Court has concluded that other allegations in the Underlying Litigation (that Andrew Crosby acted negligently when he masturbated in a room near the playroom with no intent to be seen) are within the Policy's liability coverage as an "occurence." Those allegations trigger Crestbrook's duty to defend Andrew Crosby regardless of the number other "allegations that may be excluded by the policy." *Drexel Chem. Co.*, 933 S.W. 2d at 480.[8]

      b.      *Allegations as to Molly Crosby*

As an initial matter, it is not clear there is a dispute about whether the allegations against Molly Crosby fall within the coverage language of "Coverage E—Personal Liability."[9]

---

[8] And, as discussed in Section 2 below, the Court finds that none of the exclusions argued by Crestbrook apply to the alternative negligence allegations.

[9] According to the Crosbys, "Crestbrook does not dispute that the allegations in the Underlying Complaint trigger its duty to defend Molly Crosby. Instead, Crestbrook argues that

Crestbrook's Motion argues that the allegations in the Underlying Litigation against Andrew Crosby do not constitute an "occurrence," (ECF No. 32 at PageID 603; ECF No. 32-1 at PageID 613–17), but it does not make a similar argument as to Molly Crosby.  Instead, Crestbrook's Motion argues that there is no liability coverage for Molly Crosby under the policy's Molestation Exclusion.  (ECF No. 32 at PageID 604; ECF No. 32-1 at PageID 621–23.)  The Crosbys' Motion separately sets forth allegations from the Underlying Litigation that they argue trigger the duty to defend Molly Crosby (*see* ECF No. 34 at PageID 643–45), and Crestbrook's response does not address the Crosbys' arguments about Molly Crosby (*see* ECF No. 35 at PageID 672–79 (making arguments only about Andrew Crosby)).

In the Sixth Circuit, "if a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion." *Scott v. State of Tenn.*, 878 F.2d 382 (Table), 1989 WL 72470, at *2 (6th Cir. July 3, 1989) (citing *Elmore v. Evans*, 449 F. Supp. 2, 3 (E.D. Tenn. 1976)); *Humphrey v. U.S. Att'y Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008) ("Thus, where, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived."); *Publishers Press, Inc. v. Tech. Funding, Inc.*, No. CIV.A.07-48-ART, 2008 WL 4937603, at *2 (W.D. Ky. Nov. 17, 2008) (citing *Scott*, 1989 WL 72470, at *2) (explaining that defendant failed to respond to plaintiff's motion, "and the Court treats this failure as a waiver of [defendant's] opposition to the motion").

Because Crestbrook made no separate arguments about whether the language in Coverage E covers the allegations against Molly Crosby and failed to respond to those same arguments in

---

the sexual molestation exclusion applied to Mr. Crosby also bars coverage for Molly Crosby." (ECF No. 39 at PageID 715.)

the Crosbys' Motion, the Court may consider Crestbrook's opposition to this issue waived. But even in the absence of a waiver, the Court finds that there is at least one allegation in the Underlying Litigation that triggers Crestbrook's duty to defend Molly Crosby.

The Crosbys' Motion argues that numerous allegations against Molly Crosby individually constitute an "occurrence" under the Policy. (*See* ECF No. 34 at PageID 643–45.) However, because the Court has found the alternative negligence allegations about Jane Doe seeing Andrew Crosby when he was in another room and had no intent to be seen constitute an "occurrence," it is unnecessary to analyze whether the allegations against Molly Crosby constitute separate "occurrences."[10] Crestbrook's duty to defend Molly Crosby is triggered because the complaint in the Underlying Litigation alleges that an "occurrence," Jane Doe seeing Andrew Crosby, resulted, at least in part, from Molly Crosby's own "negligent personal acts," (*see* ECF No. 34 at PageID 644), or from her "negligence arising out of the ownership . . . of real . . . property at an Insured Location," (*see* ECF No. 1-2 at PageID 63). Under this Court's reading of the Policy, that is enough to trigger Crestbrook's duty to defend Molly Crosby in the Underlying Litigation unless an exclusion from coverage applies.

2.   Do any of the Policy's exclusions apply to bar coverage?

a.   *Intentional Acts Exclusion*

For an intended or expected acts exclusion to apply, both parts of a two-pronged inquiry must be satisfied: First, the insured must have intended the act; and second, the insured must also have intended or expected that injury would result. *Tennessee Farmers Mut. Ins. Co. v. Evans*, 814 S.W.2d 49, 55 (Tenn. 1991). Whether each prong is satisfied is a "separate and distinct

---

[10] Especially because it is not clear that there is a disagreement between the parties on this issue. The same reasoning also applies as to the defamation and invasion of privacy allegations, which the Court does not address here.

inquir[y] because many intentional acts produce unexpected results and comprehensive liability insurance would be somewhat pointless if protection were precluded if . . . the intent to cause harm was not an essential (and required) showing." *Id.* (citing A J. Appleman, Insurance Law and Practice § 4501.09 at 263 (1979)).  The requisite intent "may be actual or inferred from the nature of the act and the accompanying reasonable foreseeability of harm," and "[i]t is immaterial that the actual harm was of a different character or magnitude or nature than that intended." *Id.*  At bottom, the goal of the two-pronged approach is to make sure insureds receive the benefit of the insurance policies they have paid for "without encouraging . . . [them] to incur civil tort liability." *Id.* at 55–56.

Crestbrook asserts that the Intentional Acts Exclusion bars coverage for the allegations about Jane Doe seeing Andrew Crosby masturbating,[11] but its arguments are somewhat inconsistent.  In its Motion, Crestbrook argues that intent may be inferred for both prongs.  In other words, based on "the nature of his conduct and the accompanying foreseeability of harm," (ECF No. 32-1 at PageID 619; ECF No. 35 at PageID 681), the Court should infer that Andrew Crosby intended (1) for Jane Doe to see him, and (2) to harm Jane Doe.[12]  In its response to the Crosbys'

---

[11] Crestbrook's argument about the Intentional Acts Exclusion addresses only the allegations about Jane Doe seeing Andrew Crosby masturbating.  (*See* ECF No. 32-1 at PageID 619; ECF No. 35 at PageID 680–81.)  It does not mention the defamation and invasion of privacy allegations, nor does it analyze the exclusion's application to them.  As explained above, this Court did not decide whether these allegations were an "occurrence" under the Policy; therefore, the Court also does not analyze whether the Intentional Acts Exclusion would apply.  As an aside, there appears to be a substantial amount of overlap generally between the "occurrence" and Intentional Acts Exclusion analyses.  For example, Crestbrook argues that the defamation and invasion of privacy allegations do not constitute an "occurrence" because they "caused damage that was expected," and therefore, those allegations do not "qualify as an 'occurrence' under the policy."  (ECF No. 35 at PageID 679.)

[12] *See* ECF No. 32-1 at PageID 619 (arguing "it is immaterial that there is a single allegation that Andrew Crosby did not intend to be seen by Jane because the intent is inferred from

Motion, however, Crestbrook makes a somewhat different argument: that the first prong is satisfied because "Andrew Crosby intended the act of masturbation," and the Court can infer intent as to the second prong because, even though "Andrew Crosby may not have intended for Jane to watch him masturbate, the intent that some type of injury would be inflicted is certainly inferred from the nature of the act and the accompanying reasonable foreseeability of harm." (ECF No. 35 at PageID 680.)

Crestbrook cites two cases in support of its arguments. In the first, *Assurance Co. of Am. v. Cont'l Dev. & Const., Inc.*, the underlying litigation involved the purchasers of a home, Elaine and Thomas McCord, and the home's builder, Continental Development and Construction, Inc. ("Continental"). No. 3:08-CV-0711, 2009 WL 1616760, at *1 (M.D. Tenn. June 8, 2009). The McCords alleged that a defect in the home's design and construction let rainwater accumulate in a hidden space, which allowed several types of toxic mold to grow. *Id.* The mold damaged the house and sickened the McCords. *Id.* The McCords alleged that Continental knew the home was not built to code standards and that Continental made intentional misrepresentations about the home's compliance with code standards to induce the McCords to purchase the home. *Id.* At trial, the jury found that Continental had committed actual fraud through an intentional misrepresentation and awarded the McCords compensatory damages. *Id.* at *2.

Later, Assurance Company of America ("Assurance"), which had issued an insurance policy to Continental that covered the period during which the McCords purchased the home, filed suit seeking a declaration that it had no duty to indemnify Continental for the damages awarded to

---

Andrew Crosby's act of masturbating in plain sight of where Jane could observe him and the accompanying foreseeability that it would cause harm to the plaintiffs.").

the McCords.  *Id.*  The court ruled in Assurance's favor, finding that it did not have a duty to indemnify because of an intentional acts exclusion.  *Id.* at *11.  The court found that, based on evidence presented at the trial in the underlying litigation and the jury's ultimate finding of fraud and intentional misrepresentation, Continental "intended the act," which satisfied the first prong.  *Id.* at *11–12.  The court then concluded that the second prong was also satisfied, noting expert testimony in the underlying litigation that Continental knew or should have known that the way the home was constructed could result in injury.  *Id.* at *12.

The second case Crestbrook cites, *Tennessee Farmers Mut. Ins. v. Evans*, was an unusual case of mistaken identity.  Through a series of bizarre coincidences, Mrs. Evans learned of, and then obtained access to, a safety deposit box filled with a large amount of cash that she believed belonged to her husband.  814 S.W.2d at 50–52.  Mrs. Evans became convinced her husband had obtained the cash through illegal drug sales or espionage and, fearing she had implicated herself in those wrongdoings by accessing the box, she burned the money.  *Id.* at 51.  As it turned out, the safety deposit box did not belong to Mrs. Evans' husband, and the rightful owner later sought to recover the value of the charred currency from the Evanses.  *Id.* at 52–53.  The Evanses' insurer at the time of these events, Tennessee Farmers Mutual Insurance Company ("Tennessee Farmers"), sued seeking a declaration that it had no duty to defend or indemnify Mr. or Mrs. Evans based on an intentional acts exclusion.  *Id.* at 53.  The Evanses argued that the exclusion should not apply because Mrs. Evans did not intend to harm the rightful owner of the cash because she believed the money belonged to her husband at the time she burned it.  *Id.*  The court rejected the Evanses' argument, explaining that, by burning the money, Mrs. Evans intended to damage

22

*someone*, and it was immaterial that she was mistaken about whom she was damaging when she burned the money.  *Id.* at 56.

After careful consideration, this Court does not find either version of Crestbrook's argument convincing.  First, it does not appear there is any caselaw to support Crestbrook's argument for an inference at both prongs.  If there is such caselaw, Crestbrook has failed to bring it to the Court's attention.  *Assurance* and *Evans*, the only two cases Crestbrook cites, make an inference only as to the second prong, and nothing about the facts of those cases suggests to this Court that it should infer Andrew Crosby intended for Jane Doe to see him in satisfaction of the first prong.  Nor do those cases support that the first prong is satisfied because "Andrew Crosby intended the act of masturbation."  Notably, unlike the insureds in *Assurance* and *Evans*, Andrew Crosby's "act" was not directed toward Jane Doe or anyone else.  The analysis might be different if it was alleged that Andrew Crosby intended to be seen by someone, just not Jane Doe, but the alternative negligence allegations in the Underlying Litigation plainly state he masturbated "with no intent to be seen by others."  (ECF No. 1-1 at PageID 16.)  Accordingly, the Court finds the Intentional Acts Exclusion does not apply to these allegations.

      b.    *Criminal Acts Exclusion*

What does it mean for an act to be "criminal in nature"?  There appears to be little to no Tennessee law directly on point.  Crestbrook asserts that the act does not even have to be a crime or violate the law to be "criminal in nature."[13]  The Crosbys, on the other hand, argue that a

---

[13] *See* ECF No. 35 at PageID 682 ("Unlike the poorly worded criminal statute *that did not apply* to Andrew Crosby's conduct, this exclusion plainly and unambiguously applies to Andrew Crosby's conduct, which was criminal in nature.") (emphasis added).

criminal act, *i.e.*, an act "committed or omitted in violation of law which could make the offender liable for punishment," (ECF No. 39 at PageID 711), is a prerequisite for the exclusion to apply. The Crosbys also note that some courts further limit criminal acts exclusions, applying them only "to core criminal offenses, such as burglary, robbery, and murder." (ECF No. 39 at PageID 712.)

This Court is unpersuaded by Crestbrook's argument that the act does not have to constitute a "crime" to be "criminal in nature" under the Policy's exclusion. Tennessee law directs that this Court give the Policy's language its "usual and ordinary meaning." *Naifeh*, 204 S.W. 3d at 768. "Criminal" is defined to mean "involving or being a crime." "Criminal," *Merriam-Webster's Unabridged Dictionary*, Merriam-Webster, https://unabridged.merriam-webster.com/unabridged/criminal (last accessed June 1, 2023). Therefore, for the Criminal Acts Exclusion to apply, the act at issue must involve or be a crime. Crestbrook offers two potential crimes under Tennessee law, but neither is applicable.[14]

First, Crestbrook argues Andrew Crosby's actions constitute the crime of invasion of privacy in violation of Tennessee Code Annotated § 39-13-607, which provides in relevant part as follows:

> (a) It is an offense for a person to knowingly spy upon, observe or otherwise view an individual, when the individual is in a place where there is a reasonable expectation of privacy, without the prior effective consent of the individual, if the viewing:
>
> (1) Would offend or embarrass an ordinary person if the person knew the person was being viewed; and

---

[14] Crestbrook cites the statute for indecent exposure, Tenn. Code Ann. § 39-13-511, in support of its argument that the Criminal Acts Exclusion applies, (*see* ECF No. 35 at PageID 682), yet Crestbrook acknowledges that the statute does not apply to Andrew Crosby's conduct, (*see id.*); therefore, the Court does not address that statute as a potential basis to apply the Criminal Acts Exclusion.

(2) Was for the purpose of sexual arousal or gratification of the defendant.

(b) It is not a defense to a violation of this section that the defendant was lawfully on the premises where the offense occurred.

(c) If the person being viewed is a minor, this section is violated regardless of whether the minor or the minor's parent or guardian consented to the viewing.

. . . .

Tenn. Code Ann. § 39-13-607(a)-(c).

Crestbrook's argument fails, however, because it does not consider the alternative negligence allegations. Although one version of the events in the Underlying Litigation alleges that Andrew Crosby "masturbated while watching Jane and her other minor friends," the alternative allegations do not allege that Andrew Crosby was observing or viewing Jane, just that he was "in a room near the playroom where Jane and the other girls could see him." (ECF No. 1-1 at PageID 15.) As pled, the facts in the alternative negligence allegations do not constitute a violation of Tennessee Code Annotated § 39-13-607, so that statute cannot be used to apply the Criminal Acts Exclusion.

The other crime Crestbrook suggests applies is assault under Tennessee Code Annotated § 39-13-607, which provides in relevant part as follows:

(a) A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

. . . .

Tenn. Code Ann. § 39-13-607(a)(1)-(3).

Yet Crestbrook provides no analysis for what allegations in the Underlying Litigation involve or constitute an assault under that statute.  But even if some of the allegations in the Underlying Litigation constitute assault, Crestbrook's duty to defend is nevertheless triggered if there is a single allegation that does not. Considering only the alternative negligence allegations, they do not allege that (1) Jane Doe suffered bodily injury,[15] (2) Jane Doe feared bodily injury, or (3) Andrew Crosby touched Jane Doe.

The Criminal Acts Exclusion therefore does not apply to the alternative negligence allegations that Andrew Crosby was masturbating in a different room with no intent to be seen.[16]

       c.    *Molestation Exclusion*

Finally, Crestbrook argues that it does not have a duty to defend because the Molestation Exclusion bars coverage for both Andrew Crosby and Molly Crosby.  (ECF No. 32-1 at PageID 621–23; ECF No. 35 at PageID 683–86.)  Under that exclusion, there is no coverage for damages "resulting from acts or omissions relating directly or indirectly to sexual molestation, corporal punishment, physical or mental abuse, and harassment, including sexual harassment."  (*See* ECF No. 1-2 at PageID 67.) The Policy does not define "sexual molestation" or any of the other terms included in the Molestation Exclusion.

---

[15] Crestbrook asserts that the Policy's "definition of 'bodily injury' does not include emotional or mental distress *unless it is a direct result of bodily harm.*"  (ECF No. 32-1 at PageID 613.)  And also that "Tennessee law holds that emotional injuries *not caused by physical contact or physical bodily injuries* do not constitute 'bodily injury' for purposes of this coverage."  (*Id.*) Thus, although discussed in terms of "bodily injury" under the Policy, Crestbrook seems to agree that "Jane only suffered emotional harm," and "the Underlying Complaint does not allege any 'bodily injury.'"  (*Id.*)

[16] The Court thus does not reach the Crosbys' argument that the exclusion should apply only to "core criminal offenses, such as burglary, robbery, and murder."  (ECF No. 39 at PageID 712.)

Crestbrook argues that "sexual molestation" means "the offense of disturbing children, accompanied by abnormal sexual motivations." (ECF No. 32-1 at PageID 621; ECF No. 35 at PageID 683.) Ergo, Andrew Crosby sexually molested Jane Doe because he disturbed her "by masturbating in front of her for unwanted or improper sexual activity." (ECF No. 32-1 at PageID 622; ECF No. 35 at PageID 684.) Crestbrook argues that the Crosbys' are incorrect when they argue that Andrew Crosby's actions were not directed at Jane Doe because the complaint in the Underlying Litigation asserts Andrew Crosby "entered the playroom with the full intent to masturbate while watching Jane . . ." (ECF No. 35 at PageID 684.)

The Crosbys argue that the definition of sexual molestation should be an "act of making unwanted and indecent advances to or on someone, especially for sexual gratification." (ECF No. 34 at PageID 649; ECF No. 39 at PageID 714.) They also assert that Crestbrook focuses on only one version of the allegations from the Underlying Litigation and fails to address the other allegations that they say trigger coverage. (ECF No. 34 at PageID 649; ECF No. 39 at PageID 713–14.)

This Court was unable to find a single case applying a similar exclusion to facts like those alleged in the Underlying Litigation. The single case Crestbrook cites in support of its definition of "molest," *Farmers Union Mut. Ins. v. Kienenberger*, involved an allegation that the insured's son had raped a woman. 847 P.2d 1360, 1363 (1993). Crestbrook also overlooks that the court's definition noted that "molest" was "often defined as an annoying sexual advance." *Id.*

The Crosbys' citation to *Stillwater Ins. Co. v. Dunn*, No. CV-14-01829-PHX-DGC, 2015 WL 1778349, at *5 (D. Ariz. Apr. 20, 2015), is somewhat persuasive, although the reasoning in that case is a bit muddled. (*See* ECF No. 34 at PageID 649.) In *Stillwater*, the insured, a regular

customer at a bar, at some point "and under disputed circumstances," made contact with a bartender's breast, "causing extensive injuries." *Id.* at *1. According to the bartender, the insured deliberately reached over and grabbed her breast "very hard," but the insured described the incident "as an 'accidental brush or touching of her breast.'" *Id.* The court framed the issue as "whether an accidental touching of a woman's breast is an act of sexual molestation." *Id.* at *5. Stillwater argued the sexual molestation exclusion applied, even if the insured's conduct was merely negligent, citing several cases in support. *Id.* at *6. The court rejected Stillwater's argument, explaining that the cited cases were distinguishable. *Id.* The cited cases involved claims against not only an alleged abuser, "but also against another parent or supervisor who negligently failed to prevent the abuse," and they did "not address a situation where the alleged sexual molestation was itself negligent." *Id.* The court then turned to the policy's language, noting it provided coverage for damages when an insured "accidentally causes a 'bodily injury,'" and it did "not distinguish between injuries to different parts of the body." *Id.* The court concluded that it "would make little sense" to deny coverage just because a woman's breast had been injured "as opposed to another part of her body." *Id.*

Another case, *Starr Indem. & Liab. Co. v. Young*, involved allegations against a massage therapist. No. 214CV00239RFBNJK, 2016 WL 4409194, at *1 (D. Nev. Aug. 17, 2016). The court in *Starr* rejected application of similar molestation exclusion, saying that "[a]lthough 'abuse' and 'molestation' are not defined in the Policy, it is clear that intentional and unwanted sexual contact by another constitutes 'molestation' within the plain meaning of that term." *Id.* at *5. The court acknowledged that the allegations against the therapist involved intentional and unwanted touching, but there were also "potential explanations for the [therapist's] conduct (such as it being

28

accidental) that are consistent with the allegations and that, if proven, would not trigger the exclusion." *Id.*

Here, the Court finds that the Molestation Exclusion does not bar coverage for the allegations that Andrew Crosby masturbated in a room near the playroom with no intent to be seen. The plain and ordinary meaning of "sexual molestation," even using the broad definition of "to annoy or disturb," requires intent to annoy or disturb. If Andrew Crosby did not intend to be seen, he could not have intended to annoy or disturb Jane. Accordingly, the Molestation Exclusion does not apply to the alternative negligence allegations against Andrew Crosby and cannot therefore apply to exclude coverage for Molly Crosby either.[17]

**B.**     **Duty to Indemnify Andrew Crosby or Molly Crosby**

An insurer's duty to defend is separate and distinct from its duty to indemnify. *See Am. Guar. & Liab. Ins. Co. v. Norfolk S. Ry. Co.*, 278 F. Supp. 3d, 1025, 1041 (E.D. Tenn. 2017) (citing *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 835 (Tenn. 1994)). The duty to defend is determined by the facts as alleged in the underlying complaint, *Travelers Indem. Co.*, 216 S.W.3d at 305, while the duty to indemnify is determined by the facts found by a trier of fact, *Torpoco*, 879 S.W.2d at 835. The duty to defend is therefore broader than the duty to indemnify. *Travelers Indem. Co.*, 216 S.W.3d at 305.

It is premature to determine whether Crestbrook has a duty to indemnify the Crosbys because the Underlying Litigation involves factual allegations pled in the alternative that have not been resolved. *See Main St. Am. Assurance Co. v. Marble Sols., LLC*, 557 F. Supp. 3d 844, 860

---

[17] The Crosbys also argue that the "mental abuse" and "sexual harassment" exclusions do not apply. Crestbrook, however, has not argued those exclusion apply, so the Court does not address them.

(W.D. Tenn. 2021) (collecting cases).   Accordingly, the Court **DENIES WITHOUT PREJUDICE** Plaintiff's Motion as to its duty to indemnify.[18]

## C.    The Crosbys' Bad Faith Denial of Coverage Claim under Tennessee Code Annotated § 56-7-105

The Crosbys assert a bad faith claim under Tenn. Code Ann. § 56-7-105 for Crestbrook's refusal to defend Andrew Crosby.  (*See* ECF No. 27 at PageID 472–73.)  Crestbrook argues that the claim must be dismissed because Tennessee's bad faith statute does not apply to liability claims.  (*See* ECF No. 32-1 at PageID 625–27; ECF No. 44 at PageID 750–54.)  The Crosbys acknowledge that a recent Tennessee Court of Appeals case, *Giles v. Geico Gen. Ins. Co.*, 643 S.W.3d 171 (Tenn. Ct. App. 2021), held that the bath faith statute does not apply to liability policies, but they contend the court erred in that case because it did not consider a change in the statutory language.  (*See* ECF No. 39 at PageID 720–22.)

In *Giles*, the Tennessee Court of Appeals discussed the history of Tennessee's bad faith statute and cases interpreting it.  643 S.W.3d at 176–84.  As explained in *Giles*, the Tennessee Supreme Court declared early on that the statute applied only to insurance contracts that "bear interest from the time they become due and payable," such as "life insurance policies, fire insurance policies, [and] accident insurance policies."  *Id.* at 177 (citing *People's Bank & Tr. Co. v. U.S. Fid. & Guar. Co.*, 3 S.W.2d 163, 164 (Tenn. 1928) and *Tenn. Farmers Mut. Ins. Co. v. Cherry*, 213 Tenn. 391, 374 S.W.2d 371, 372 (1964)).  The court acknowledged, however, that uncertainty had developed regarding the continued validity of *People's Bank* and *Cherry* due to a series of more recent Tennessee Supreme Court cases that were inconsistent with their holdings,

---

[18] The Crosbys did not move for a determination on the duty to indemnify and argued it would be premature to do so.  (*See* ECF No. 34 at PageID 652; ECF No. 39 at PageID 719.)

but which did not expressly reference or mention either case.  *Id.* at 181–83.  Ultimately, the court

concluded that the more recent Tennessee Supreme Court cases should not be interpreted as

overruling *People's Bank* or *Cherry*, and the court therefore held that the bad faith statute was not

applicable to the automobile insurance policy at issue. *Id.* at 184.

The Crosbys argue that the reasoning in *Giles* is flawed because it did not recognize a

change in the statutory language.  Specifically, the Crosbys argue that before August 2008, the bad

faith statute provided in relevant part as follows:

> The insurance companies of this state, and foreign insurance companies and other
> persons or corporations doing an insurance or fidelity bonding business in this state,
> in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days
> after a demand has been made by the holder of the policy or fidelity bond on which
> the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, **in
> addition to the loss and interest thereon**, a sum not exceeding twenty-five percent
> (25%) on the liability for the loss; provided, that it is made to appear to the court or
> jury trying the case that the refusal to pay the loss was not in good faith, and that
> the failure to pay inflicted additional expense, loss, or injury including attorney fees
> upon the holder of the policy or fidelity bond; and provided, further, that the
> additional liability, within the limit prescribed, shall, in the discretion of the court
> or jury trying the case, be measured by the additional expense, loss, and injury
> including attorney fees thus entailed.

(*See* ECF No. 39 at PageID 720 (citing "Tenn. Code Ann. § 56-7-105(a) (effective before August

14, 2008).")

After August 2008, however, "and at the times relevant for the Crosbys' bad faith claim,"

they assert the statutory language had been changed to provide as follows:

> The insurance companies of this state, and foreign insurance companies and other
> persons or corporations doing an insurance or fidelity bonding business in this state,
> in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days
> after a demand has been made by the holder of the policy or fidelity bond on which
> the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, **in
> addition to the loss and interest on the bond**, a sum not exceeding twenty-five
> percent (25%) on the liability for the loss; provided, that it is made to appear to the
> court or jury trying the case that the refusal to pay the loss was not in good faith,
> and that the failure to pay inflicted additional expense, loss, or injury including

31

attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

(*See* ECF No. 39 at PageID 721 (citing "Tenn. Code Ann. § 56-7-105(a) (effective August 14, 2008).")

The Crosbys argue that although *Giles* recited the post-2008 statutory language ("interest on the bond"), its analysis quoted and relied on cases that interpreted the pre-2008 statutory language ("interest thereon").  According to the Crosbys, the *Giles* court "never once address[ed] the fact that the language of the statue had been changed to delete the very phrase upon which it and all the prior courts it was citing based their reasoning." (ECF No. 39 at PageID 721.)  They assert that the change in the statutory language means "the bad faith statute is no longer limited to policies bearing interest," and, therefore, the statute applies to their bad faith claim.  (ECF No. 39 at PageID 722.)  However, for the reasons set forth below, this Court does not interpret the change in the statutory language to alter the meaning or effect of the statute.

The Crosbys argue that the statutory language was changed effective August 2008, yet the legislative history for the statute reflects that the legislature last amended the statute in 2000 when "including attorney fees" was added in two places after "additional expenses, loss or injury."  *See* Act to amend Tennessee Code Annotated, Section 56-7-105, relative to awarding attorney fees, 2000 Public Acts, ch. 701, § 1 (eff. May 9, 2000).  Nothing in the history of the statute available on Westlaw or Lexis explains how or why the statutory language changed in August 2008.[19]

---

[19] Curiously, the Westlaw version of the statute shown as "effective August 14, 2008," does not include the "interest on the bond" language but instead says "interest thereon."  See the attached Addendum at page A-1 and also ECF No. 44-1 at PageID 758.  Compare with the Crosbys' Exhibit 2 at ECF No. 39-2 at PageID 730, which reflects the "interest on the bond" language.  Based on the Thompson Reuters footers on the parties' attachments, the Crosbys

Today, the statute once again includes the "interest thereon" language of the "pre-August 2008" statute.[20]   Resources on Westlaw and Lexis note that the Tennessee Code Commission replaced "on the bond" with "thereon" following "loss and interest" in 2022.[21]   The Lexis commentary further indicates this was done "to restore the original language of the 1981 act."  So, the Court did some digging.

As *Giles* and *Cherry* recount, the Tennessee legislature first enacted the bad faith statute in 1901.  *See Giles*, 643 S.W.3d at 176; *Cherry*, 375 S.W.2d at 372.  As enacted by the legislature, the act provided in relevant part as follows:

> That the several insurance companies of this State, and foreign insurance companies and other corporations, firms or persons doing an insurance business in this State, in all cases when a loss occurs and they refuse to pay the same within sixty days after a demand shall have been made by the holder of said policy on which said loss occurred, shall be liable to pay the holder of said policy, **in addition to the loss and interest thereon**, a sum not exceeding twenty-five per cent on the liability for said loss; Provided, that it shall be made to appear to the Court or Jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss or injury upon the holder of said policy; and, provided, further, that such additional liability within the limit prescribed shall, in the discretion of the Court or Jury trying the case, be measured by the additional expense, loss and injury thus entailed.

*See* Act to impose additional liability upon insurance companies and other corporations, firms or persons, for failure to promptly pay insurance losses and a liability upon policy holders where suits

---

retrieved and printed the statute sometime in 2022, while Crestbrook retrieved and printed the statute in 2023.

[20] See Addendum at pages A-1 to A-2.

[21]  *See* Editor's and Revisor's Notes, Westlaw (noting that "The Tennessee Code Commission, in subsec. (a), substituted "thereon" for "on the bond" following "loss and interest" in 2022) (last accessed June 1, 2023); Commentary, Code Commission Notes, Lexis (explaining that "In order to restore the original language of the 1981 act, "loss and interest thereon" was substituted for "loss and interest on in the bond" in the middle of (a)") (last accessed June 1, 2023). See Addendum at pages A-4 to A-6.

are not brought in good faith, 1901 Acts of Tennessee, ch. 141, § 1 (passed April 16, 1901)

(emphasis added).[22]

The next major change to the relevant statutory language was in 1981, when the legislature

added the references to fidelity bonds:[23]

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance *or fidelity bonding* business in this state, in all cases when a loss occurs and there refuse to pay the same within sixty (60) days after a demand shall have been made by the holder of the policy *or fidelity bond* on which said loss occurred, shall be liable to pay the holder of said policy *or fidelity bond*, **in addition to the loss and interest therein**, a sum not exceeding twenty-five percent (25%) on the liability for said loss; provided, that it shall be made to appear to the court or jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury upon the holder of said policy or fidelity bond; and, provided, further, that such additional liability, within the limit prescribed, shall, in the discretion of the

---

[22] Copy included in Addendum at page A-7.

[23] As the *Giles* court noted, § 56-7-105 was previously codified as § 56-1105. *See Giles*, 643 S.W.3d at 176. The court's assertion that the statutory numbering was changed in 1981, however, may not be accurate. *See Giles*, 643 S.W.3d at 180 ("In 1981, Tennessee Code Annotated section 56-1105 became section 56-7-105.") Although the 1981 act struck and replaced § 56-7-105 in its entirety, it appears the statutory re-numbering occurred prior to that time. *See* Act Relative to the liability of insurers for bad faith refusal to pay insurance losses and to amend Tennessee Code Annotated, Section 56-7-105, 1981 Public Acts, ch. 354 (in attached Addendum at page A-10). For example, the 1980 publication of the Tennessee Code Annotated reflects the § 56-7-105 statutory numbering. *See* Tenn. Code Ann. § 56-7-105 (1980 Replacement) (in attached Addendum at page A-12). It is the Court's understanding that the renumbering from § 56-1105 to § 56-7-105 occurred sometime in the 1970s when the entire code changed from a two-part to a three-part numbering system.
Another note—what is now subsection (b) in § 56-7-105 was enacted in 1955. *See* Act related to insurers not authorized to transact business in this State; providing for actions in this State against and for the service of process upon such insurers; prescribing how a defense may be made by such insurers; and providing for the allowance of attorneys' fees in actions against such insurers, 1955 Public Acts of Tennessee, ch. 2, § 4 (passed January 25, 1955) (in attached Addendum at page A-14). It was originally separately codified as § 56-336. *See* Tenn. Code Ann. § 56-336 (1955 Cumulative Supplement) (in attached Addendum at page A-18). It was moved to § 56-1105 in 1968. *See* Tenn. Code Ann. § 56-1105 & Parallel Reference Tables (1968 Replacement) (in attached Addendum at page A-24).

court or jury trying the case, be measured by the additional expense, loss, and injury thus entailed.

*See* Act relative to the liability of insurers for bad faith refusal to pay insurance losses and to amend Tennessee Code Annotated, Section 56-7-105, 1981 Public Acts, ch. 354, § 1 (passed May 5, 1981).[24]

Notably, the language as enacted in 1981 is largely the same as the original language from 1901, except it adds fidelity bonds, and uses "therein" in place of "thereon" after "interest."  As discussed above, since 1981, the only legislative change to the statutory language came in 2000, when the legislature added "including attorney fees" after "additional expenses, loss or injury," so that the statute then read as follows:

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury **including attorney fees** upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury **including attorney fees** thus entailed.

Tenn. Code Ann. § 56-7-105(a) (emphasis added).

In sum, the substance of the statute has remained largely unchanged since it was first enacted in 1901.  Although the legislature added references to fidelity bonds in 1981, the statutory language at issue here is nearly identical to that used in 1901, save the difference in "thereon" versus "therein."

---

[24] Copy in attached Addendum at page A-10.

So, what about the language change in 2008?  It is this Court's understanding, based on research and inquiries, that the change was made by the Tennessee Code Commission.[25]  The Court was, however, unable to obtain written records or documents reflecting the change.

The Tennessee Code Commission is authorized to make certain edits to the acts of the general assembly, including but not limited to, "rearrange, regroup and renumber the titles, chapters, sections and parts of sections of the statutes, codes and code supplements," "change reference numbers to agree with any renumbered chapter or section," "correct manifest misspelling and typographical errors and to change capitalization and spelling for the purpose of uniformity," and "make other stylistic, nonsubstantive changes if such changes are consistent with style guidelines that have been approved by the commission and submitted to the judiciary committee of the senate and the civil justice committee of the house of representatives."  *See* Tenn. Code Ann. § 1-1-108(a).  However, "the commission shall not alter the sense, meaning or effect of any act of the general assembly . . . ."  *See id.*

If the Code Commission was responsible for the change, then that change could not have altered the meaning of § 56-7-105 because the Code Commission lacks authority to make substantive changes to the meaning of the Tennessee Code.  If the Code Commission was not responsible for the change, it is unclear how or by whom that change would have been made; the only certainty is that it does not appear to have been the result of a separate, specific act passed by the legislature to amend the statutory language.[26]  In the absence of specific legislative action, this

---

[25] The Code Commission's 2022 revision reverts the relevant portion of § 56-7-105(a) to the pre-2008 "in addition to the loss and interest thereon" language, which also supports that the initial change in 2008 was done by the Code Commission.

[26] The legislature annually reenacted the "on the bond" language, likely beginning in 2009 and continuing through 2022, when it passed the annual codification bill.  *See* Tenn. Code Ann. §

Court declines to read the language's alteration as a substantive change to the meaning of the statute.   To do so would abrogate the interpretation and meaning given to the statute by the Tennessee Supreme Court since *People's Bank* in 1928, even though there is no indication that the legislature intended to make such a substantive change.       For this reason, the Court does not find persuasive the Crosbys' argument that the analysis in *Giles* is flawed because it fails to address the changed statutory language.   Based on the reasoning set forth in *Giles*, the Court finds that a bad faith claim under Tenn. Code Ann. § 56-7-105 is unavailable for liability insurance policies, like the one at issue here.   Plaintiff's Motion is **GRANTED** as to the Crosbys' claim for bad faith under Tenn. Code Ann. § 56-7-105 (Count II of Molly Caldwell Crosby's and Andrew K. Crosby's Counterclaim Against Crestbrook Insurance Company (*see* ECF No. 27 at PageID 473–74)).

### D.     The Crosbys' Claim for Negligence

The Crosbys also assert a claim for negligence against Crestbrook for "disclosing their personal, financial, confidential, non-public information in a public filing."   (ECF No. 27 at PageID 475.)   The Crosbys argue that Crestbrook was negligent when it attached an unredacted copy of the Policy to the Complaint filed in this matter.[27]   (*See* ECF No. 39 at PageID 723.)   The Crosbys assert that the disclosure allowed counsel for Jane Doe in the Underlying Litigation to

---

1-2-114(b)(1)(C).   That annual reenactment, however, does not appear to specifically include the language of § 56-7-105; instead, it references volume numbers of the Tennessee Code along with their specific annual editions.   *See* Tenn. Code Ann. § 1-2-114(b)(1)(C) ("The material contained in replacement volumes . . . 10 (2016 edition), . . . shall be deemed amendatory of, supplemental to and become part of the Tennessee Code enacted as chapter 6 of the Public Acts of 1955, as though such material were specifically reenacted in its entirety.").   Without more, this Court is unconvinced that this annual, non-specific reenactment could be relied on as evidence of legislative intent for a change to any specific statute.

[27] The Clerk's office sealed the unredacted copy of the Policy on August 8, 2022 at the request of Crestbrook's counsel, and Crestbrook filed a redacted copy of the Policy that same day. (*See* ECF No. 15.)

learn the limits of the Policy, which counsel then used in settlement negotiations.  (*Id.*)  Crestbrook maintains that it was not negligent because the Federal Rules of Civil Procedure do not require the Policy's limits to be redacted, and further, disclosure of the Policy's limits was necessary to establish that the amount in controversy was satisfied for purposes of 28 U.S.C. § 1332.  (*See* ECF No. 32-1 at PageID 625–27.)

Under Tennessee law, a plaintiff must establish the following elements for a claim of negligence: (1) a duty of care owed by the defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.  *King v. Anderson Cty.*, 419 S.W.3d 232, 246 (Tenn. 2013) (citing *Giggers v. Memphis Hous. Authority*, 277 S.W.3d 359, 364 (Tenn. 2009)).

Tennessee law recognizes that "a duty of reasonable care arises whenever a defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property."  *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 362 (Tenn. 2008) (citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)).  The cases setting forth this general rule, however, primarily involve "*physical* harm to another's person or property."  *Faber v. Ciox Health, LLC*, 944 F.3d 593, 598 (6th Cir. 2019) (citing *Satterfield*, 266 S.W.3d at 362, Dan B. Dobbs et al., The Law of Torts § 127 (2d ed. 2019), and Restatement (Third) of Torts § 6 (2010)) (emphasis in original).  Of course, physical harm is not "the only type of cognizable injury under Tennessee negligence law," which also recognizes claims such as "negligent infliction of emotional distress and negligent misrepresentation causing economic injury."  *Faber*, 944 F.3d at 598 (citing *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004) and *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 429 (Tenn. 1991)).  Whether a defendant owes the plaintiff a duty of care is a question of law to be resolved by the court.  *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993).

The Crosbys' claim fails because they have not established that Crestbrook owed them a duty of care under these circumstances.  In essence, the Crosbys assert that Crestbrook was under a duty not to publicly disclose the Policy's limits, and by doing so, Crestbrook has disadvantaged them during settlement negotiations in the Underlying Litigation.  The Crosbys have not cited a single case in which a court allowed a similar negligence claim.  Nor has this Court been able to find a case that would support a negligence claim for disclosure of insurance policy limits that were allegedly used to an insured's detriment in other litigation.  Plaintiff's Motion is therefore **GRANTED** as to the Crosbys' negligence claim (Count IV of Molly Caldwell Crosby's and Andrew K. Crosby's Counterclaim Against Crestbrook Insurance Company (*see* ECF No. 27 at PageID 475)).

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Judgment on the Pleadings (ECF No. 32) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(a)     **DENIED** as to Crestbrook's duty to defend Andrew Crosby in the Underlying Litigation;

(b)     **DENIED** as to Crestbrook's duty to defend Molly Crosby in the Underlying Litigation;

(c)     **DENIED WITHOUT PREJUDICE** as to Crestbrook's duty to indemnify Andrew Crosby in the Underlying Litigation;

(d)     **DENIED WITHOUT PREJUDICE** as to Crestbrook's duty to indemnify Molly Crosby in the Underlying Litigation;

(e)     **GRANTED** as to Andrew Crosby and Molly Crosby's bad faith claim under Tenn. Code Ann. § 56-7-105 (Count II of Molly Caldwell Crosby's and Andrew K. Crosby's Counterclaim Against Crestbrook Insurance Company (*see* ECF No. 27 at PageID 473–74), which is hereby **DISMISSED**; and

(f)     **GRANTED** as to the Andrew Crosby and Molly Crosby's negligence claim (Count IV of Molly Caldwell Crosby's and Andrew K. Crosby's Counterclaim Against

Crestbrook Insurance Company (*see* ECF No. 27 at PageID 475), which is hereby **DISMISSED**.

Further, for the reasons set forth above, Molly and Andrew Crosby's Motion for Judgment on the Pleadings (ECF No. 33) is (a) **GRANTED** as to Crestbrook's duty to defend Andrew Crosby in the Underlying Litigation, and (b) **GRANTED** as to Crestbrook's duty to defend Molly Crosby in the Underlying Litigation.

**IT IS SO ORDERED**, this 1st day of June, 2023.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE

# ADDENDUM[28]

| Document | Page Number |
|---|:---:|
| Tenn. Code Ann. § 56-7-105 (retrieved from Westlaw on June 1, 2023) | A-1 |
| Tenn. Code Ann. § 56-7-105 (retrieved from Lexis on June 1, 2023) | A-2 |
| Westlaw's Editor and Revisor's Notes for Tenn. Code Ann. § 56-7-105 (retrieved from Westlaw on June 1, 2023) | A-4 |
| Tenn. Code Ann. § 56-7-105 with Lexis Commentary Annotations (retrieved from Lexis on June 1, 2023) | A-5 |
| 1901 Acts of Tennessee, ch. 141, § 1 | A-7 |
| 1981 Public Acts of Tennessee, ch. 354 | A-10 |
| Tenn. Code Ann. § 56-7-105 (1980 Replacement) | A-12 |
| 1955 Public Acts of Tennessee, ch. 2, § 4 | A-14 |
| Tenn. Code Ann. § 56-336 (1955 Cumulative Supplement) | A-18 |
| Tenn. Code Ann. § 56-1105 & Parallel Reference Tables (1968 Replacement) | A-24 |

---

[28] Thank you to the Librarians at the Tennessee State Library and Archives for patiently answering the Court's many questions and providing the Court copies of the of the Public Acts of Tennessee and prior versions of the Tennessee Code Annotated included in the Addendum. The Court is very grateful for all your assistance.

West's Tennessee Code Annotated
   Title 56. Insurance
      Chapter 7. Policies and Policyholders (Refs & Annos)
         Part 1. General Provisions (Refs & Annos)

T. C. A. § 56-7-105

§ 56-7-105. Bad faith refusal to pay

Effective: August 14, 2008
Currentness

(a) The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

(b) In any action against an unauthorized foreign or alien insurer or bonding company upon a contract of insurance or fidelity bond issued or delivered in this state to a resident of this state or to a corporation authorized to do business in this state, if the insurer or bonding company has failed for thirty (30) days after demand prior to commencement of the action to make payment in accordance with the terms of the contract or fidelity bond, and it appears to the court that the refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include the fee in any judgment that may be rendered in the action. The fee shall not exceed twelve and one half percent (12.5%) of the amount that the court or jury finds the plaintiff is entitled to recover against the insurer or bonding company, but in no event shall the fee be less than twenty-five dollars ($25.00). Failure of an insurer or bonding company to defend the action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause.

**Credits**
1901 Acts, c. 141, § 1; 1955 Pub.Acts, c. 2, § 4; 1981 Pub.Acts, c. 354, § 1; 2000 Pub.Acts, c. 701, § 1, eff. May 9, 2000.

**Formerly** Shannon's Code, § 3369a141; 1932 Code, § 6434; § 56-1105.

Notes of Decisions (230)

T. C. A. § 56-7-105, TN ST § 56-7-105
Current with laws from the 2023 Regular Sess. of the 113th Tennessee General Assembly. Pursuant to §§ 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code and, until then, may make editorial changes to the statutes. References to the updates made by the most recent legislative session should be to the Public Chapter and not to the T.C.A. until final revisions have been made to the text, numbering, and hierarchical headings on Westlaw to conform to the official text. Unless legislatively provided, section name lines are prepared by the publisher.

## *Tenn. Code Ann. § 56-7-105*

Current through Chapter 114, as well as Chapters 116 through 142 and Chapters 144 through 150 of the 2023 Regular Session. The commission may make editorial changes to this version and may relocate or redesignate text. Those changes will appear on Lexis Advance after the publication of the certified volumes and supplements. Pursuant to TCA sections 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code. Until the annual issuance of the certified volumes and supplements, references to the updates made by the most recent legislative session should be to the Public Chapter and not TCA.

*TN - Tennessee Code Annotated  >  Title 56 Insurance  >  Chapter 7 Policies and Policyholders  >  Part 1 General Provisions*

## 56-7-105. Additional liability upon insurers and bonding companies for bad-faith failure to pay promptly.

**(a)**  The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

**(b)**  In any action against an unauthorized foreign or alien insurer or bonding company upon a contract of insurance or fidelity bond issued or delivered in this state to a resident of this state or to a corporation authorized to do business in this state, if the insurer or bonding company has failed for thirty (30) days after demand prior to commencement of the action to make payment in accordance with the terms of the contract or fidelity bond, and it appears to the court that the refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include the fee in any judgment that may be rendered in the action. The fee shall not exceed twelve and one half percent (12.5%) of the amount that the court or jury finds the plaintiff is entitled to recover against the insurer or bonding company, but in no event shall the fee be less than twenty-five dollars ($25.00). Failure of an insurer or bonding company to defend the action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause.

## History

Tenn. Code Ann. § 56-7-105

Acts 1901, ch. 141, § 1; Shan., § 3369a141; Code 1932, § 6434; Acts 1955, ch. 2, § 4; T.C.A. (orig. ed.), § 56-1105; Acts 1981, ch. 354, § 1; *2000, ch. 701, § 1*.

TENNESSEE CODE ANNOTATED

Copyright © 2023 by The State of Tennessee All rights reserved

---

**End of Document**

**Editor's and Revisor's Notes (1)**

**HISTORICAL AND STATUTORY NOTES**

The Tennessee Code Commission, in subsec. (a), substituted ''thereon'' for ''on the bond'' following ''loss and interest'' in 2022.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

## *Tenn. Code Ann. § 56-7-105*

Current through Chapter 114, as well as Chapters 116 through 142 and Chapters 144 through 150 of the 2023 Regular Session. The commission may make editorial changes to this version and may relocate or redesignate text. Those changes will appear on Lexis Advance after the publication of the certified volumes and supplements. Pursuant to TCA sections 1-1-110, 1-1-111, and 1-2-114, the Tennessee Code Commission certifies the final, official version of the Tennessee Code. Until the annual issuance of the certified volumes and supplements, references to the updates made by the most recent legislative session should be to the Public Chapter and not TCA.

*TN - Tennessee Code Annotated  >  Title 56 Insurance  >  Chapter 7 Policies and Policyholders  >  Part 1 General Provisions*

## 56-7-105. Additional liability upon insurers and bonding companies for bad-faith failure to pay promptly.

**(a)**  The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

**(b)**  In any action against an unauthorized foreign or alien insurer or bonding company upon a contract of insurance or fidelity bond issued or delivered in this state to a resident of this state or to a corporation authorized to do business in this state, if the insurer or bonding company has failed for thirty (30) days after demand prior to commencement of the action to make payment in accordance with the terms of the contract or fidelity bond, and it appears to the court that the refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include the fee in any judgment that may be rendered in the action. The fee shall not exceed twelve and one half percent (12.5%) of the amount that the court or jury finds the plaintiff is entitled to recover against the insurer or bonding company, but in no event shall the fee be less than twenty-five dollars ($25.00). Failure of an insurer or bonding company to defend the action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause.

## History

Acts 1901, ch. 141, § 1; Shan., § 3369a141; Code 1932, § 6434; Acts 1955, ch. 2, § 4; T.C.A. (orig. ed.), § 56-1105; Acts 1981, ch. 354, § 1; *2000, ch. 701, § 1*.

Annotations

## Commentary

### Code Commission Notes.

In order to restore the original language of the 1981 act, "loss and interest thereon" was substituted for "loss and interest on the bond" in the middle of (a).

## Case Notes

1. Constitutionality.
2. Construction.
3. —With Court Rules.
4. Applicability.
5. Assignability of Claims.
6. Nonexclusivity of Remedies.
7. Federal Preemption.
8. Policies Covered.
9. Policies Not Covered.
10. Tort of Bad Faith.
11. Demand for Payment.
12. —Sufficiency of Demand.
13. —Time for Demand.
14. Suits.
15. —Jurisdictional Amount.
16. —Allegations.
17. —Issues.
18. —Burden of Proof.
19. —Required Showing of Bad Faith.
20. —Grounds for Refusal to Pay.
21. — —Honest Attempt to Settle.
22. — —Legal Question Involved.
23. —Facts Showing Ground for Refusal.



# ACTS

OF THE

# STATE OF TENNESSEE

PASSED BY THE

## FIFTY-SECOND GENERAL ASSEMBLY

*1901*

PUBLISHED BY AUTHORITY

NASHVILLE, TENN.:
BRANDON PRINTING COMPANY, PRINTERS AND STATIONERS
1901

—248—

## CHAPTER 141.

### Senate Bill No. 117.

AN ACT to impose additional liability upon insurance companies and other corporations, firms or persons, for failure to promptly pay insurance losses and a liability upon policy holders where suits are not brought in good faith.

Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That the several insurance companies of this State, and foreign insurance companies and other corporations, firms or persons doing an insurance business in this State, in all cases when a loss occurs and they refuse to pay the same within sixty days after a demand shall have been made by the holder of said policy on which said loss occurred, shall be liable to pay the holder of said policy, in addition to the loss and interest thereon, a sum not exceeding twenty-five per cent on the liability for said loss; Provided, that it shall be made to appear to the Court or Jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss or injury upon the holder of said policy; and, provided, further, that such additional liability within the limit prescribed shall, in the discretion of the Court or Jury trying the case, be measured by the additional expense, loss and injury thus entailed.

Sec. 2. *Be it further enacted,* That in the event it shall be made to appear to the Court or Jury trying the cause that the action of said policy holder in bringing said suit was not in good faith, and recovery under said policy shall not be had, said policy holder shall be liable to such insurance companies, corporations, firms or persons in a sum not exceeding twenty-five per cent of the amount of the loss claimed under said policy; Provided, that such liability, within the limits prescribed shall, in the discretion of the Court or Jury trying the cause, be measured by the additional expense, loss or injury inflicted upon said insurance companies, corporations, firms or persons by reason of said suit.

Sec. 3. *Be it further enacted,* That all Acts and parts of Acts in conflict with this Act be and the same are hereby re-



—249—

pealed, and that this Act take effect from and after its passage, the public welfare requiring it.

Passed April 16, 1901.

NEWTON H. WHITE,
*Speaker of the Senate.*
E. B. WILSON,
*Speaker of the House of Representatives.*
Approved April 18, 1901.

BENTON McMILLIN,
*Governor.*

---

## CHAPTER 142.

### Senate Bill No. 460.

AN ACT to amend an Act entitled "An Act to preserve the purity of elections and define and punish offenses against the elective franchise," being Chapter 14, Acts of 1897.

Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That Section 4, Chapter 4, Acts 1897, be and the same is hereby amended by inserting after the closing clause thereof, and before the clause fixing the grade of offense, the following, viz.: "And it shall be unlawful for any person or persons, except the officers holding the elections, to approach nearer to any voter or to any ballot box than thirty feet, when the said voter is in the act of casting his ballot or offering or proposing to exercise the elective franchise."

Sec. 2. *Be it further enacted,* That the judges and officers of any and all legal elections are hereby authorized and empowered to construct a railing or double gangway through which voters may approach the ballot box and retire therefrom; Provided, this shall only apply to counties of 30,000 inhabitants or over, under the Federal census of 1900, or any subsequent Federal census.

Sec. 3. *Be it further enacted,* That this Act take effect from and after its passage, the public welfare requiring it.

Passed April 17, 1901.

NEWTON H. WHITE,
*Speaker of the Senate.*
E. B. WILSON,
*Speaker of the House of Representatives.*
Approved April 18, 1901.

BENTON McMILLIN,
*Governor.*

A-9



# PUBLIC ACTS
of the
## STATE OF TENNESSEE
Passed by the

## NINETY-SECOND

## GENERAL ASSEMBLY

## 1981

### PUBLISHED BY AUTHORITY

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1.  Tennessee Code Annotated, Section 55-10-406, is amended by adding at the end thereof a new subsection, as follows:

(e) Nothing in this section shall affect the admissibility in evidence in criminal prosecutions for aggravated assault or homicide by the use of a motor vehicle only, of any chemical analysis of the alcoholic content of the defendant's blood which has been obtained by any means lawful without regard to the provisions of this section.

SECTION 2.  This act shall take effect upon becoming a law, the public welfare requiring it.

PASSED: April 30, 1981

John S. Wilder,
SPEAKER OF THE SENATE

Ned R. McWherter,
SPEAKER OF THE HOUSE OF REPRESENTATIVES

APPROVED: May 19, 1981

Lamar Alexander,
GOVERNOR

---

CHAPTER NO. 354

SENATE BILL NO. 718

By White

Substituted for:  House Bill No. 681

By Turner

AN ACT Relative to the liability of insurers for bad faith refusal to pay insurance losses and to amend Tennessee Code Annotated, Section 56-7-105.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

SECTION 1.  Tennessee Code Annotated, Section 56-7-105, is amended by striking the section in its entirety and by inserting therein the following:

(a)  The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the same within sixty (60) days after a demand shall have been made by the holder of the policy or fidelity bond on which said loss occurred, shall be liable to pay the holder of said policy or fidelity bond, in addition to the loss and interest therein, a sum not exceeding twenty-five percent (25%) on the liability for said loss;

provided, that it shall be made to appear to the court or jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury upon the holder of said policy or fidelity bond; and, provided, further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury thus entailed.

(b)  In any action against an unauthorized foreign or alien insurer or bonding company upon a contract of insurance or fidelity bond issued or delivered in this state to a resident thereof or to a corporation authorized to do business therein if the insurer or bonding company has failed for thirty (30) days after demand prior to commencement of the action to make payment in accordance with the terms of the contract or fidelity bond, and it appears to the court that such refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action.  Such fee shall not exceed twelve and one-half percent (12 1/2 %) of the amount which the court or jury finds the plaintiff is entitled to recover against the insurer or bonding company, but in no event shall such fee be less than twenty-five dollars ($25.00).  Failure of an insurer or bonding company to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause.

SECTION 2.  This act shall take effect upon becoming a law, the public welfare requiring it.

PASSED: May 5, 1981

John S. Wilder,
SPEAKER OF THE SENATE

Ned R. McWherter,
SPEAKER OF THE HOUSE OF REPRESENTATIVES

APPROVED: May 19, 1981

Lamar Alexander,
GOVERNOR

---

CHAPTER NO. 355

SENATE BILL NO. 771

By Ford

Substituted for:  House Bill No. 1110

By DeBerry

AN ACT To amend Tennessee Code Annotated, Title 14, Chapter 1, relative to records, reports and documents of the Department of Human Services.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE:

# TENNESSEE CODE

## *Annotated*

The Official Tennessee Code as Enacted by the Seventy-ninth
General Assembly, Chapter 6, Public Acts 1955,
With Supplemental Enactments, Amendments
and New Laws

———

Completely Annotated

———

SAM B. GILREATH, Lebanon, Tennessee
Editorial Consultant to Original Code

### VOLUME 10A

### 1980 Replacement

Prepared Under the Supervision of the
Tennessee Code Commission

LEGISLATIVE LIBRARY
WAR MEMORIAL BUILDING
NASHVILLE, TENNESSEE 37219



RAY L. BROCK, JR., Chairman
JAMES A. CLODFELTER, Executive Secretary
WILLIAM J. HARBISON
WILLIAM MCMILLAN LEECH, JR.
CLETUS W. MCWILLIAMS

THE MICHIE COMPANY
*Law Publishers*
CHARLOTTESVILLE, VIRGINIA
1980

between such foreign country and the United States. [Acts 1895, ch. 160, § 23; Shan., § 3307; Code 1932, § 6127; T.C.A. (orig. ed.), § 56-1104.]

Collateral References. 45 C.J.S. Insurance § 674.

**56-7-105. Additional liability upon insurers for failure to pay promptly insurance losses when refusal is not in good faith. —** (a) The insurance companies of this state, and foreign insurance companies and other persons doing an insurance business in this state, in all cases when a loss occurs and they refuse to pay the same within sixty (60) days after a demand shall have been made by the holder of the policy on which said loss occurred, shall be liable to pay the holder of said policy, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for said loss; provided, that it shall be made to appear to the court or jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury upon the holder of said policy; and, provided, further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury thus entailed.

(b) In any action against an unauthorized foreign or alien insurer upon a contract of insurance issued or delivered in this state to a resident thereof or to a corporation authorized to do business therein, if the insurer has failed for thirty (30) days after demand prior to the commencement of the action to make payment in accordance with the terms of the contract, and it appears to the court that such refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action. Such fee shall not exceed twelve and one-half percent (12½%) of the amount which the court or jury finds the plaintiff is entitled to recover against the insurer, but in no event shall such fee be less than twenty-five dollars ($25.00). Failure of an insurer to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause. [Acts 1901, ch. 141, § 1; Shan., § 3369a141; Code 1932, § 6434; Acts 1955, ch. 2, § 4; T.C.A. (orig. ed.), § 56-1105.]

**Cross-References.** Automobile liability insurance, survival of cause of action, assignability, §§ 20-624 — 20-626.

**Report** to commissioner of revenue upon approval of proof of death by insurance company, § 30-1636.

**Section to Section References.** This section is referred to in § 56-14-112.

**Textbooks.** Gibson's Suits in Chancery (5th ed., Crownover), § 1126.

**Law Reviews.** Excess Liability of Insurers in Tennessee (P. Fleissner), 38 Tenn. L. Rev. 82.

Insurance — 1954 Tennessee Survey, 7 Vand. L. Rev. 851.

Insurance — 1959 Tennessee Survey (William R. Andersen), 12 Vand. L. Rev. 1213.

Insurance — 1962 Tennessee Survey (Robert N. Covington), 16 Vand. L. Rev. 773.

Workmen's Compensation — Propriety of Punitive Damages, 31 Tenn. L. Rev. 272.

**Cited:** Bates v. Equitable Life Assurance Soc'y, 27 Tenn. App. 17, 177 S.W.2d 360 (1943); Tennessee Farmers Mut. Ins. Co. v. Hammond, 43 Tenn. App. 62, 306 S.W.2d 13 (1957); Cashen v. Camden Fire Ins. Ass'n, 48 Tenn. App. 470, 348 S.W.2d 883 (1961); Smith v. Insurance Co. of N. America, 213 F. Supp. 675 (M.D. Tenn. 1962); Kernodle v. Peerless Life Ins. Co., 213 Tenn.

[SEE TABLE IN FRONT OF THIS VOLUME FOR CHANGES IN SECTION NUMBERING]



PUBLIC ACTS

of the

STATE OF TENNESSEE

Passed by the

Seventy-Ninth General

Assembly

1955

PUBLISHED BY AUTHORITY

PRINTED BY
RICH PRINTING COMPANY
NASHVILLE

Passed: January 25, 1955.

JAMES L. BOMAR,
*Speaker of the House of Representatives.*

JARED MADDUX,
*Speaker of the Senate.*

Approved: January 27, 1955.

FRANK G. CLEMENT,
*Governor.*

---

# CHAPTER NO. 2

## HOUSE BILL No. 27

### (By Collins and Headden)

AN ACT relating to insurers not authorized to transact business in this State; providing for actions in this State against and for the service of process upon such insurers; prescribing how a defense may be made by such insurers; and providing for the allowance of attorneys' fees in actions against such insurers.

SECTION 1.  *Be it enacted by the General Assembly of the State of Tennessee:*

*Purpose of Act.*—The purpose of this Act is to subject certain insurers to the jurisdiction of courts of this State in suits by or on behalf of insureds or beneficiaries under insurance contracts.

The legislature declares that it is a subject of concern that many residents of this State hold policies of insurance issued or delivered in this State by insurers while not authorized to do business in this State, thus presenting to such residents the often

insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies.  In furtherance of such State interest, the legislature herein provides a method of substituted service of process upon such insurers and declares that in so doing it exercises its power to protect its residents and to define, for the purpose of this statute, what constitutes doing business in this State, and also exercises powers and privileges available to the State by virtue of Public Law 15, 79th Congress of the United States, Chapter 20, 1st Session, S. 340, which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states.

SECTION 2.  *Be it further enacted:*

*Service of Process Upon Unauthorized Insurer.* —(a) Any of the following acts in this State, effected by mail or otherwise, by an unauthorized foreign or alien insurer; (1) the issuance or delivery of contracts of insurance to residents of this State or to corporations authorized to do business therein, (2) the solicitation of applications for such contracts, (3) the collection of premiums, membership fees, assessments or other considerations for such contracts, or (4) any other transaction of insurance business, is equivalent to and shall constitute an appointment by such insurer of the Commissioner of Insurance and his successor or successors in office, to be its true and lawful attorney, upon whom may be served all lawful process in any action, suit, or proceeding instituted by or on behalf of an insured or beneficiary arising out of any such contract of insurance, and any such act shall be signification of its agreement that such service of process is of the same legal force and validity as personal service of process in this State upon such insurer.

(b) Such service of process shall be made by delivering to and leaving with the Commissioner of Insurance or some person in apparent charge of his office two copies thereof and the payment to him of such fees as may be prescribed by law. The Commissioner of Insurance shall forthwith mail by registered mail one of the copies of such process to the defendant at its last known principal place of business, and shall keep a record of all process so served upon him. Such service of process is sufficient, provided notice of such service and a copy of the process are sent within ten (10) days thereafter by registered mail by plaintiff or plaintiff's attorney to the defendant at its last known principal place of business, and the defendant's receipt, or receipt issued by the postoffice with which the letter is registered, showing the name of the sender of the letter and the name and address of the person to whom the letter is addressed, and the affidavit of the plaintiff or plaintiff's attorney showing a compliance herewith are filed with the clerk of the court in which such action is pending on or before the date the defendant is required to appear, or within such further time as the court may allow.

(c) Service of process in any such action, suit or proceeding shall in addition to the manner provided in subsection (b) of this section be valid if served upon any person within this State who, in this State on behalf of such insurer, is (1) soliciting insurance, or (2) making, issuing or delivering any contract of insurance, or (3) collecting or receiving any premium, membership fee, assessment or other consideration for insurance; and a copy of such process is sent within ten (10) days thereafter by registered mail by the plaintiff or plaintiff's attorney to the defendant at the last known principal place of business of the defendant, and the defend-

ant's receipt, or the receipt issued by the postoffice with which the letter is registered, showing the name of the sender of the letter and the name and address of the person to whom the letter is addressed, and the affidavit of the plaintiff or plaintiff's attorney showing a compliance herewith are filed with the clerk of the court in which such action is pending on or before the date the defendant is required to appear, or within such further time as the court may allow.

(d) No plaintiff or complainant shall be entitled to a judgment by default, or a judgment with leave to prove damages, or a judgment pro confesso under this Section until the expiration of thirty (30) days from the date of the filing of the affidavit of compliance.

(e) Nothing in this Section contained shall limit or abridge the right to serve any process, notice or demand upon any insurer in any other manner now or hereafter permitted by law.

SECTION 3.  *Be it further enacted:*

*Defense of Action by Unauthorized Insurer.*—Before any unauthorized foreign or alien insurer shall file or cause to be filed any pleading in any action, suit or proceeding instituted against it, such unauthorized insurer shall deposit with the clerk of the court in which such action, suit or proceeding is pending cash or securities or file with such clerk a bond with good and sufficient sureties, to be approved by the court, in an amount to be fixed by the court sufficient to secure the payment of any final judgment which may be rendered in such action; or (2) procure a certificate of authority to transact the business of insurance in this State.

(b) The court in any action, suit or proceeding, in which service is made in the manner provided in subsections (b) or (c) of Section 2 may, in its discretion, order such postponement as may be necessary to afford the defendant reasonable opportunity to comply with the provisions of subsection (a) of this Section and to defend such action.

(c) Nothing in subsection (a) of this Section is to be construed to prevent an unauthorized foreign or alien insurer from filing a motion to quash a writ or to set aside service thereof made in the manner provided in subsections (b) or (c) of Section 2 hereof on the ground either (1) that such unauthorized insurer has not done any of the acts enumerated in subsection (a) of Section 2, or (2) that the person on whom service was made pursuant to subsection (c) of Section 2 was not doing any of the acts therein enumerated.

SECTION 4.  *Be it further enacted:*

*Attorney fees.*—In any action against an unauthorized foreign or alien insurer upon a contract of insurance issued or delivered in this State to a resident thereof or to a corporation authorized to do business therein, if the insurer has failed for thirty (30) days after demand prior to the commencement of the action to make payment in accordance with the terms of the contract, and it appears to the court that such refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action.  Such fee shall not exceed twelve and one-half per cent of the amount which the court or jury finds the plaintiff is entitled to recover against the insurer, but in no event shall such fee be less than

twenty-five ($25) Dollars.  Failure of an insurer to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause.

SECTION 5.  *Be it further enacted:*

*Constitutionality.*—If any provision of this Act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

SECTION 6.  *Be it further enacted:*

*Short Title.*—This Act may be cited as the Unauthorized Insurers Process Act.

SECTION 7.  *Be it further enacted:*

That all laws or parts of laws in conflict with the provisions of this Act be, and the same are, hereby repealed.

SECTION 8.  *Be it further enacted:*

That this Act take effect from and after its passage, the public welfare requiring it.

Passed: January 25, 1955.

JAMES L. BOMAR,
*Speaker of the House of Representatives.*

JARED MADDUX,
*Speaker of the Senate.*

Approved: January 27, 1955.

FRANK G. CLEMENT,
*Governor.*

# 1955
## CUMULATIVE SUPPLEMENT
# ENNESSEE CODE ANNOTATED

### The Compilation of the Public Acts of the Regular Session of the Seventy-ninth General Assembly

---

### Completely Annotated

---

## VOLUME 1

Prepared under the Supervision of the
Tennessee Code Commission



A. B. NEIL, Chairman
HARRY PHILLIPS, Executive Secretary
ALFRED T. ADAMS, SR., Vice Chairman
SAM L. FELTS, SR.
GEORGE F. McCANLESS

THE BOBBS-MERRILL COMPANY, INC.
PUBLISHERS

**Place this supplement in the pocket of the corresponding volume of the set**

## ACTS OF 1947 TO 1955

7

### ACTS OF 1947

| Ch. | Sec. | Herein |
|---|---|---|
| 19 | 1-7 | R '55, c. 14, § 11 |
| 189 | 1 | R '55, c. 127, § 14 |

### ACTS OF 1949

| Ch. | Sec. | Herein |
|---|---|---|
| 16 | 1-6 | S. 54-607 |
|  |  | —54-613 |

| Ch. | Sec. | Herein |
|---|---|---|
| 95 | 1 | R '55, c. 307, § 6 |
| 118 | 1-12 | R '55, c. 243, § 12 |
| 269 | 1 | R '55, c. 215, § 1 |

### ACTS OF 1951

| Ch. | Sec. | Herein |
|---|---|---|
| 11 | 1 | R '55, c. 215, § 1 |
| 246 | 1-22 | R '55, c. 211, § 4 |
| 249 | 1-3 | R '55, c. 66, § 3 |

### ACTS OF 1953

| Ch. | Sec. | Herein |
|---|---|---|
| 122 | 1 | S. 6-2628 |
|  |  | —6-2635 |
| 158 | 1-7 | S. 34-1008 |
|  |  | —34-1017 |
| 159 | 1-3 | R '55, c. 327, § 2 |

## ACTS OF 1955

| Ch. | Sec. | Herein | Ch. | Sec. | Herein | Ch. | Sec. | Herein |
|---|---|---|---|---|---|---|---|---|
| 1 | 1, 2 | 62-717 | 8 | 11 | 43-525 | 19 | 1, 2 | 16-208 |
|  | 3 | Eff. |  | 12 | 43-526 |  | 3 | Rplg. |
| 2 | 1 | L. Int. |  | 13 | 43-101 |  | 4 | Eff. |
|  | 2 | 56-328—56-332 |  | 14 | Rplg. | 20 | 1 | 53-438 |
|  | 3 | 56-333—56-335 |  | 15 | Sep. |  | 2 | 53-439 |
|  | 4 | 56-336 |  | 16 | Eff. |  | 3 | Eff. |
|  | 5 | Sep. | 9 | 1 | 52-207 | 21 | 1 | 50-1308 |
|  | 6 | 56-327 |  | 2 | 52-209 |  | 2 | 50-1330 |
|  | 7 | Rplg. |  | 3 | Eff. |  | 3 | Eff. |
|  | 8 | Eff. | 10 | 1 | 59-421 | 22 | 1 | 4-647 |
| 3 | 1 | 56-323 |  | 2 | Eff. |  | 2 | Eff. |
|  | 2 | 56-324 | 11 | 1-10 | Spec. | 23 | 1, 2 | 14-523 |
|  | 3 | 56-325 | 12 | 1 | 23-2606 |  | 3 | Eff. |
|  | 4 | 56-326 |  | 2 | 23-2607 | 24 | 1 | 14-203 |
|  | 5 | Eff. |  | 3 | Temp. |  | 2 | Eff. |
| 4 | 1 | 56-3301 |  | 4 | Sep. | 25 | 1 | 14-112 |
|  | 2 | 56-3302—56-3305 |  | 5 | Rplg. |  | 2 | Eff. |
|  | 3 | 56-3306, 56-3307 |  | 6 | Eff. | 26 | 1, 2 | 14-221 |
|  | 4 | 56-3308—56-3314 | 13 | 1 | 56-301—56-308 |  | 3 | Eff. |
|  | 5 | 56-3315, 56-3316 |  | 2 | 56-202 | 27 | 1 | 14-303 |
|  | 6 | 56-3317—56-3319 |  | 3 | 56-708 |  | 2 | Eff. |
|  | 7 | 56-3320 |  | 4 | 56-1724 | 28 | 1 | 14-320 |
|  | 8 | 56-3321 |  | 5 | 56-707 |  | 2 | Eff. |
|  | 9 | 56-3322 |  | 6 | 56-322 | 29 | 1 | 39-210 |
|  | 10 | 56-3323 |  | 7 | 56-1917 |  | 2 | 39-211 |
|  | 11 | Rplg. |  | 8 | Sep. |  | 3 | Eff. |
|  | 12 | Sep. |  | 9 | Eff. | 30 | 1 | 14-403 |
|  | 13 | Temp. | 14 | 1 | 43-609 |  | 2 | 14-431 |
|  | 14 | Eff. |  | 2 | 43-610 |  | 3 | 14-432 |
| 5 | 1 | 50-1359 |  | 3 | 43-611 |  | 4 | Eff. |
|  | 2 | 50-1360 |  | 4 | 43-612 | 31 | 1 | 39-217 |
|  | 3 | 50-1361 |  | 5 | 43-613 |  | 2 | Eff. |
|  | 4 | Rplg. |  | 6 | 43-614 | 32 | 1 | 14-504 |
|  | 5 | Eff. |  | 7 | 43-615 |  | 2 | Eff. |
| 6 |  | Enactment of Code |  | 8 | 43-616 | 33 | 1-10 | Temp. |
| 7 | 1 | 6-1803 |  | 9 | 43-617 | 34 | 1 | 53-504 |
|  | 2 | Eff. |  | 10 | 43-618 |  | 2 | 53-505 |
| 8 | 1 | 43-515 |  | 11 | Rplg. |  | 3 | Eff. |
|  | 2 | 43-516 |  | 12 | Sep. | 35 | 1, 2 | 53-1202 |
|  | 3 | 43-517 |  | 13 | Eff. |  | 3 | Eff. |
|  | 4 | 43-518 | 15 | 1 | 8-3416 | 36 | 1 | 63-209 |
|  | 5 | 43-519 |  | 2 | Eff. |  | 2 | Eff. |
|  | 6 | 43-520 | 16 | 1 | 45-431 | 37 | 1 | 3-401 |
|  | 7 | 43-521 |  | 2 | Eff. |  | 2 | 3-406 |
|  | 8 | 43-522 | 17 | 1 | 37-315 |  | 3 | Eff. |
|  | 9 | 43-523 |  | 2 | Rplg. | 38 | 1 | 54-540 |
|  | 10 | 43-524 |  | 3 | Eff. |  | 2 | 54-541 |
|  |  |  | 18 | 1, 2 | Spec. |  | 3 | 54-542 |
|  |  |  |  |  |  |  | 4 | Eff. |

# 1955
## CUMULATIVE SUPPLEMENT
# TENNESSEE CODE ANNOTATED

The Compilation of the Public Acts of the Regular Session
of the Seventy-ninth General Assembly

---

### Completely   Annotated

---

## VOLUME 10

Prepared under the Supervision of the
Tennessee Code Commission



A. B. NEIL, Chairman
HARRY PHILLIPS, Executive Secretary
ALFRED T. ADAMS, SR., Vice Chairman
SAM L. FELTS, SR.
GEORGE F. McCANLESS

THE BOBBS-MERRILL COMPANY, INC.
PUBLISHERS

**Place this supplement in the pocket of the
corresponding volume of the set**

---

56-327                           INSURANCE                                    20

company or other insurance entity which is financially owned or financially controlled by any alien or foreign government outside the continental limits of the United States or the territories of the United States, or by any representative or agent of any such company or entity, is hereby declared to be a public nuisance, and the commissioner of insurance is hereby authorized and empowered to enjoin such nuisance by injunctive proceedings in the chancery court in like manner as is provided by the general statutes pertaining to enjoining nuisances. [Acts 1955, ch. 3, § 4.]

**Effective Date.** Acts 1955, ch. 3, § 5. January 27, 1955.

**Cross-References.** Injunction of nuisances, §§ 23-302—23-312.

**56-327. Unauthorized insurers process—Short title.**—Sections 56-327—56-336 may be cited as the Unauthorized Insurers Process Act. [Acts 1955, ch. 2, § 6.]

**Compiler's Note.** Section 1, ch. 2, Acts 1955, provided: "The purpose of this act is to subject certain insurers to the jurisdiction of courts of this state in suits by or on behalf of insureds or beneficiaries under insurance contracts.

"The legislature declares that it is a subject of concern that many residents of this state hold policies of insurance issued or delivered in this state by insurers while not authorized to do business in this state, thus presenting to such residents the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies. In furtherance of such state interest, the legislature herein provides a method of substituted service of process upon such insurers and declares that in so doing it exercises its power to protect its residents and to define, for the purpose of this statute, what constitutes doing business in this state, and also exercises powers and privileges available to the state by virtue of public law 15, 79th congress of the United States, chapter 20, 1st session, section 340, which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states."

**Comparative Legislation.** Process against unauthorized insurers:
Ark. Stat. 1947, §§ 66-240—66-249.
Fla. Stat. Ann., §§ 625.28-625.33.
La. Rev. Stat. 1950, 22:1251-22:1256.
Mass. Laws Ann., ch. 175B, §§ 1-6.
Mich. Comp. Laws 1948, §§ 548.1-548.6.
N. Car. Gen. Stat., § 58-164.
Pa. Purdon's Stat., tit. 37, §§ 1005.1-1005.6.

**56-328. Acts constituting commissioner as attorney for service of process.**—Any of the following acts in this state, effected by mail or otherwise, by an unauthorized foreign or alien insurer; (1) the issuance or delivery of contracts of insurance to residents of this state or to corporations authorized to do business therein, (2) the solicitation of applications for such contracts, (3) the collection of premiums, membership fees, assessments or other considerations for such contracts, or (4) any other transaction of insurance business, is equivalent to and shall constitute an appointment by such insurer of the commissioner of insurance and his successor or successors in office, to be its true and lawful attorney, upon whom may be served all lawful process in any action, suit, or proceeding instituted by or on behalf of an insured or beneficiary arising out of any such contract of insurance, and any such act shall be signification of its agreement that such service of process is of the same legal force and validity as personal service of process in this state upon such insurer. [Acts 1955, ch. 2, § 2.]

21

**56-329.   Method of service—Notice to defendant.**—Such service of process shall be made by delivering to and leaving with the commissioner of insurance or some person in apparent charge of his office two (2) copies thereof and the payment to him of such fees as may be prescribed by law. The commissioner of insurance shall forthwith mail by registered mail one (1) of the copies of such process to the defendant at its last known principal place of business, and shall keep a record of all process so served upon him. Such service of process is sufficient, provided notice of such service and a copy of the process are sent within ten (10) days thereafter by registered mail by plaintiff or plaintiff's attorney to the defendant at its last known principal place of business, and the defendant's receipt, or receipt issued by the postoffice with which the letter is registered, showing the name of the sender of the letter and the name and address of the person to whom the letter is addressed, and the affidavit of the plaintiff or plaintiff's attorney showing a compliance herewith are filed with the clerk of the court in which such action is pending on or before the date the defendant is required to appear, or within such further time as the court may allow. [Acts 1955, ch. 2, § 2.]

Section to Section Reference. This section is referred to in §§ 56-330, 56-334, 56-335.

**56-330.   Personal service on agent or representative—Copy of notice to defendant.**—Service of process in any such action, suit or proceeding shall in addition to the manner provided in § 56-329 be valid if served upon any person within the state who, in this state on behalf of such insurer, is (1) soliciting insurance, or (2) making, issuing or delivering any contract of insurance, or (3) collecting or receiving any premium, membership fee, assessment or other consideration for insurance; and a copy of such process is sent within ten (10) days thereafter by registered mail by the plaintiff or plaintiff's attorney to the defendant at the last known principal place of business of the defendant, and the defendant's receipt, or the receipt issued by the postoffice with which the letter is registered, showing the name of the sender of the letter and the name and address of the person to whom the letter is addressed, and the affidavit of the plaintiff or plaintiff's attorney showing a compliance herewith are filed with the clerk of the court in which such action is pending on or before the date the defendant is required to appear, or within such further time as the court may allow. [Acts 1955, ch. 2, § 2.]

Section to Section Reference. This section is referred to in §§ 56-334, 56-335.

**56-331.   Time allowed before judgment.**—No plaintiff or complainant shall be entitled to a judgment by default, or a judgment with leave to prove damages, or a judgment pro confesso under §§ 56-328—56-332 until the expiration of thirty (30) days from the date of the filing of the affidavit of compliance. [Acts 1955, ch. 2, § 2.]

22

**56-332. Provisions supplemental.**—Nothing in §§ 56-328—56-332 contained shall limit or abridge the right to serve any process, notice or demand upon any insurer in any other manner now or hereafter permitted by law. [Acts 1955, ch. 2, § 2.]

**56-333. Defense by insurer—Bond or certificate of authority.**—Before any unauthorized foreign or alien insurer shall file or cause to be filed any pleading in any action, suit or proceeding instituted against it, such unauthorized insurer shall deposit with the clerk of the court in which such action, suit or proceeding is pending cash or securities or file with such clerk a bond with good and sufficient sureties, to be approved by the court, in an amount to be fixed by the court sufficient to secure the payment of any final judgment which may be rendered in such action; or (2) procure a certificate of authority to transact the business of insurance in this state. [Acts 1955, ch. 2, § 3.]

**56-334. Discretionary continuances.**—The court in any action, suit or proceeding, in which service is made in the manner provided in § 56-329 or § 56-330 may, in its discretion, order such postponement as may be necessary to afford the defendant reasonable opportunity to comply with the provisions of § 56-333, and to defend such action. [Acts 1955, ch. 2, § 3.]

**56-335. Motions to quash or set aside service.**—Nothing in § 56-333 is to be construed to prevent an unauthorized foreign or alien insurer from filing a motion to quash a writ or to set aside service thereof made in the manner provided in § 56-329 or § 56-330 on the ground either (1) that such unauthorized insurer has not done any of the acts enumerated in § 56-328, or (2) that the person on whom service was made pursuant to § 56-330 was not doing any of the acts therein enumerated. [Acts 1955, ch. 2, § 3.]

**56-336. Attorney fees.**—In any action against an unauthorized foreign or alien insurer upon a contract of insurance issued or delivered in this state to a resident thereof or to a corporation authorized to do business therein, if the insurer has failed for thirty (30) days after demand prior to the commencement of the action to make payment in accordance with the terms of the contract, and it appears to the court that such refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action. Such fee shall not exceed twelve and one-half per cent (12½%) of the amount which the court or jury finds the plaintiff is entitled to recover against the insurer, but in no event shall such fee be less than twenty-five dollars ($25.00). Failure of an insurer to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause. [Acts 1955, ch. 2, § 4.]

**Effective Date.** Acts 1955, ch. 2, § 8. January 27, 1955.

# TENNESSEE CODE

## *Annotated*

The Official Tennessee Code as Enacted by the Seventy-ninth
General Assembly, Chapter 6, Public Acts 1955,
With Supplemental Enactments, Amendments and New Laws

---

#### Completely Annotated

---

SAM B. GILREATH, Lebanon, Tennessee
Editorial Consultant to Original Code

### VOLUME 10
1968 Replacement

Prepared Under the Supervision of the
Tennessee Code Commission



HAMILTON S. BURNETT, Chairman
ALFRED T. ADAMS, SR., Vice Chairman
R. ARNOLD KRAMER, Executive Secretary
SAM L. FELTS, SR.
GEORGE F. MCCANLESS



THE **BOBBS-MERRILL** COMPANY, INC.
A SUBSIDIARY OF HOWARD W. SAMS & CO., INC.
*Publishers* • INDIANAPOLIS • NEW YORK

# PARALLEL REFERENCE TABLES

Title 56—Original Code and Supplements to 1968 Replacement

Due to amendments and the inclusion of new laws it became necessary to rearrange the sections appearing in chapters 2 and 3 of title 56. The following table shows such changes.

| Original Code and Supp. | 1968 Replacement | Original Code and Supp. | 1968 Replacement | Original Code and Supp. | 1968 Replacement | Original Code and Supp. | 1968 Replacement |
|---|---|---|---|---|---|---|---|
| 56-201 | Repealed | 56-226 | 56-324 | 56-251 | 56-333 | 56-311 | 56-233 |
| 56-202 | 56-204 | 56-227 | 56-325 | 56-252 | 56-334 | 56-312 | 56-234 |
| 56-203 | 56-204 | 56-228 | 56-326 | 56-253 | 56-335 | 56-313 | 56-235 |
| 56-204 | 56-204 | 56-229 | 56-327 | 56-254 | 56-336 | 56-314 | 56-236 |
| 56-205 | 56-219 | 56-230 | 56-321 | 56-255 | 56-337 | 56-315 | 56-237 |
| 56-206 | 56-220 | 56-231 | 56-322 | 56-256 | 56-338 | 56-316 | 56-238 |
| 56-207 | 56-221 | 56-232 | 56-301 | 56-257 | 56-339 | 56-317 | 56-239 |
| 56-208 | 56-222 | 56-233 | 56-302 | 56-258 | 56-312 | 56-318 | 56-240 |
| 56-209 | 56-223 | 56-234 | 56-329 | 56-259 | 56-313 | 56-319 | 56-243 |
| 56-210 | 56-224 | 56-235 | 56-330 | 56-260 | 56-314 | 56-320 | 56-244 |
| 56-211 | 56-225 | 56-236 | 56-331 | 56-261 | 56-315 | 56-321 | 56-245 |
| 56-212 | 56-226 | 56-237 | 56-242 | 56-262 | 56-316 | 56-322 | 56-217 |
| 56-213 | 56-227 | 56-238 | 56-340 | 56-263 | 56-317 | 56-323 | 56-228 |
| 56-214 | 56-303 | 56-239 | 56-341 | 56-264 | 56-318 | 56-324 | 56-229 |
| 56-215 | 56-304 | 56-240 | 56-342 | 56-265 | 56-319 | 56-325 | 56-230 |
| 56-216 | 56-305 | 56-241 | 56-343 | 56-266 | 56-320 | 56-326 | 56-231 |
| 56-217 | 56-306 | 56-242 | 56-344 | 56-301 | 56-202 | 56-327 | 56-246 |
| 56-218 | 56-307 | 56-243 | 56-345 | 56-302 | 56-201 | 56-328 | 56-247 |
| 56-219 | 56-308 | 56-244 | 56-346 | 56-303 | 56-203 | 56-329 | 56-248 |
| 56-220 | 56-309 | 56-245 | 56-347 | 56-304 | 56-214 | 56-330 | 56-249 |
| 56-221 | 56-310 | 56-246 | 56-348 | 56-305 | 56-215 | 56-331 | 56-250 |
| 56-222 | 56-311 | 56-247 | 56-349 | 56-306 | 56-218 | 56-332 | 56-251 |
| | | | | 56-307 | 56-213 | 56-333 | 56-252 |
| 56-223 | 56-212 | 56-248 | 56-350 | 56-308 | 56-216 | 56-334 | 56-253 |
| 56-224 | 56-328 | 56-249 | 56-351 | 56-309 | 56-241 | 56-335 | 56-254 |
| 56-225 | 56-323 | 56-250 | 56-332 | 56-310 | 56-232 | 56-336 | 56-1105 |

xi

occurrence of hostilities between such foreign country and the United States. [Acts 1895, ch. 160, § 23; Shan., § 3307; Code 1932, § 6127.]

Collateral References. 45 C. J. S., Insurance, § 674.

**56-1105.   Additional liability upon insurers for failure to pay promptly insurance losses when refusal is not in good faith.—A.** The insurance companies of this state, and foreign insurance companies and other persons doing an insurance business in this state, in all cases when a loss occurs and they refuse to pay the same within sixty (60) days after a demand shall have been made by the holder of the policy on which said loss occurred, shall be liable to pay the holder of said policy, in addition to the loss and interest thereon, a sum not exceeding twenty-five per cent (25%) on the liability for said loss; provided, that it shall be made to appear to the court or jury trying the case that the refusal to pay said loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury upon the holder of said policy; and, provided, further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury thus entailed.

B. In any action against an unauthorized foreign or alien insurer upon a contract of insurance issued or delivered in this state to a resident thereof or to a corporation authorized to do business therein, if the insurer has failed for thirty (30) days after demand prior to the commencement of the action to make payment in accordance with the terms of the contract, and it appears to the court that such refusal was vexatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action. Such fee shall not exceed twelve and one-half per cent (12½%) of the amount which the court or jury finds the plaintiff is entitled to recover against the insurer, but in no event shall such fee be less than twenty-five dollars ($25.00). Failure of an insurer to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause. [Acts 1901, ch. 141, § 1; Shan., § 3369a141; Code 1932, § 6434; Acts 1955, ch. 2, § 4.]

Cross-References. Automobile liability insurance, survival of cause of action, assignability, §§ 20-624—20-626.

Report to commissioner of revenue upon approval of proof of death by insurance company, § 30-1636.

Text Books. Gibson's Suits in Chancery (5th ed., Crownover), § 1126.

Law Reviews. Insurance — 1954 Tennessee Survey, 7 Vand. L. Rev. 851.

Insurance — 1959 Tennessee Survey (William R. Andersen), 12 Vand. L. Rev. 1213.

Insurance — 1962 Tennessee Survey (Robert N. Covington), 16 Vand. L. Rev. 773.

Workmen's Compensation — Propriety of Punitive Damages, 31 Tenn. L. Rev. 272.

Comparative Legislation. Penalty on insurer upon failure to pay:

Ark. Stat. 1947, § 66-3238.

La. Rev. Stat. 1950, 22:656-22:658.

Mo. Rev. Stat. 1949, § 375.420.

Cited: Bates v. Equitable Life Assur. Soc. (1943), 27 Tenn. App. 17, 177 S. W. (2d) 360; Tennessee Farmers Mut. Ins. Co. v. Hammond (1957), 43 Tenn. App. 62, 306 S. W. (2d) 13; Cashen v. Camden Fire Ins. Assn. (1961), 48 Tenn. App. 470, 348 S. W. (2d) 883; Smith v. Insurance Company of North America (1962),